## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JANE DOE 20, JANE DOE 21,
JANE DOE 20, JANE DOE 23,
and JOHN DOE 24,

                        Plaintiffs,

vs.

EASTERN MICHIGAN UNIVERSITY
BOARD OF REGENTS (official capacity
only); MELODY WERNER, in her
official capacity as Eastern Michigan
University's Title IX Coordinator, and individual
Capacity; EASTERN MICHIGAN UNIVERSITY
POLICE DEPARTMENT, a municipal corporation;
CHIEF OF POLICE ROBERT HEIGHES,
in his official and individual capacity; DEPUTY
CHIEF DANIEL KARRICK, in his official and
individual capacity; ALPHA SIGMA PHI
FRATERNITY – GAMMA UPSILON CHAPTER;
ALPHA SIGMA PHI FRATERNITY, INC.,

                        Defendants.

Case No.
Hon.

TODD F. FLOOD (P58555)
VINCENT J. HAISHA (P76506)
JOHN H. MOTT (P81990)
Attorneys for Plaintiff
Flood Law, PLLC
155 W. Congress St., Ste. 603
Detroit, MI 48227
PH: (248) 547-1032
FX: (248) 547-0140
tflood@floodlaw.com
vhaisha@floodlaw.com
jmott@floodlaw.com

MICHAEL D. WEAVER (P43985)
Plunkett Cooney
38505 Woodward Avenue, Ste. 2000
Bloomfield Hills, MI 48304
mweaver@plunkettcooney.com

## **Complaint for Damages and Injunctive Relief and Jury Demand**

There is a civil action between these parties arising out of
the same transaction or occurrence as alleged in this
Complaint, Case No. 21-cv-10649 currently pending
before the Honorable Linda V. Parker and filed on March
24, 2021.

NOW COME, Plaintiffs, JANE DOE 20, JANE DOE 21, JANE DOE 20,

JANE DOE 23, and JOHN DOE 24, who hereby reallege and incorporate by

reference the common allegations as stated in JANE DOE 1, et al. v. Eastern

Michigan Board of Regents, et al., case number 21-cv-10649 as though previously

stated herein:

## TABLE OF CONTENTS

**Introduction**……………………………………………………………**6**

**EMU Officials Were Aware and Tacitly Approved of its Campus Rape
Culture by Purposefully Disregarding Reports of Rape, Misleading Victims
and Discouraging Them from Reporting Their Assaults to Title IX or Law
Enforcement**…………………………………………………………**6**

**Defendant Melody Werner Had Actual Notice of Sexual Assaults**…………..**11**

**Parties**………………………………………………..………………....**15**

**Jurisdiction and Venue**………………………………………………..…**18**

**Title IX**………………………………………………………….....**19**

**Mandated Reporting of Sexual Misconduct on EMU campus by Greek Life**…**23**

**Fraudulent Concealment of Sexual Misconduct on EMU's campus**…………**28**

**Defendant Melody Werner's Fraudulent Concealment**………………………..**31**

**All Defendants' Fraudulent Concealment**……………………………………...**34**

**Factual Allegations**……………………………………………..…..**39**

**Jane Doe 20**………………………………………………………....**39**
    **EMU's Actual Notice of Kilby's Prior Sexual Misconduct**……………..**39**
    **Night of the Assault**……………………………………………**41**
    **Subsequent Harassment**…………………………………………**46**
    **Concealment and Concert of Actions**…………………………**47**

**Jane Doe 21**……………………………………………..…….**48**
    **Night of the Assault**……………………………………………**49**
    **Subsequent Harassment**…………………………………………**55**
    **Concealment and Concert of Actions**…………………………**56**

**Jane Doe 22**……………………………………………..……**60**
    **Night of the Assault**……………………………………………**60**

**Subsequent Harassment**……………………………………………......62
**Mystic Circle**……………………………………………………….....63
**Reporting and Inaction**……………………………………………......64
**Defendant Melody Werner's Inaction**…………………………….....64

**Jane Doe 23**…………………………………………………………….67
**Night of the Assault**…………………………………………………68
**Failure of EMU's Women's Resources**…………………………….71
**Title IX Failure and Mismanagement**……………………………...72
**Subsequent Contact and Harassment**……………………………...74

**John Doe 24**……………………………………………………………75
**Night of the Assault**…………………………………………………76
**Subsequent Harassment and Stalking**…………………………......78
**Continued Contact**…………………………………………………..79
**Concealment and Concert of Actions**…………………………......79

**Count I**: Violation of Title IX – Deliberate Indifference (*EMU Defendants*)...81

**Count II**: Violation of Title IX – Hostile Environment (*EMU Defendants*)….90

**Count III**: Violation of Title IX – Retaliation (*EMU Defendants*)……………93

**Count IV**: Violation of 42 USC 1983 – State Created Danger (*Werner, Heighes and Karrick*)……………………………………………………………94

**Count V**: Violation of 42 USC 1983 – Equal Protection (*EMU Defendants*)….97

**Count VI**: Violation of 42 USC 1983 – Bodily Integrity (*Werner, Heighes and Karrick*)……………………………………………………………....100

**Count VII**: Violation of ELCA – Sex Discrimination (*All Defendants*)……..104

**Count VIII**: Aiding and Abetting in Violation of ELCRA (*All Defendants*)..107

**Count IX**: Gross Negligence (*ASP National and Chapter*)………………. …..108

**Count X**: Negligence (*ASP National and Chapter*)……………………………111

**Count XI**: Negligent Supervision (*ASP National and Chapter*)………………113

**Count XII**: Negligent Failure to Warn/Protect (*ASP National and Chapter*)……………………………………………….. …………………..115

**Count XIII**: IIED (*Defendants EMU Regents, EMUPD, Werner, Heighes, Karrick ASP – Chapter*) ……………………………………………...……117

**Count XIV**: Social Host Liability (*ASP - Chapter*)…………………………...120

**Count XV**: Violation of Art. 1, §17 – State Created Danger (*Regents*)….…..122

**Plaintiffs' Damages**………………………………………………………..124

# INTRODUCTION

## EMU OFFICIALS WERE AWARE AND CONSTRUCTIVELY APPROVED OF ITS CAMPUS RAPE CULTURE BY PURPOSEFULLY DISREGARDING REPORTS OF RAPE, MISLEADING RAPE VICTIMS AND DISCOURAGING THEM FROM REPORTING THEIR ASSAULTS TO TITLE IX OR LAW ENFORCEMENT

1.      Students at Eastern Michigan University ("EMU") have been subjected to a long history of hazing, bullying, harassment, and sexual assaults. EMU, through its actions, inactions and deliberate indifference, endorsed and enabled this culture to exist within its campus community through mismanagement of Title IX. For years the EMU campus culture has been overrun with epidemic levels of underage drinking and sexual assaults, many of which took place at fraternity-sanctioned events, after which credible reports were made to EMU Officials, specifically to Defendant Melody Werner (Title IX Coordinator).

2.      Recent disturbing events at EMU demonstrate that despite the March 25, 2021 filing of this Complaint, students remain unprotected from a dangerous culture of sexual assault which continues to flourish on campus without any meaningful oversight or intervention on the part of EMU and its Officials.  On August 29, 2021 upon information and belief, a young woman was sexually assaulted by multiple assailants both on and off campus following a fraternity party where alcohol was served. EMU's only response to this gang rape was to issue a

6

campus wide alert instructing students to walk with co-workers, be aware of their surroundings and take a seminar on self-awareness and self-defense. Upon information and belief, EMU's fraternities and sororities are continuing to host autumn events without interruption.

3.     As this most recent incident is unfolding in the investigation process, it is emerging that EMU's fraternities and sororities continue to promote and fail to monitor underage drinking by all Defendants. What is more disturbing, is that the facts will illuminate utter disregard for Title IX regulations, and failing to use plain common-sense to prevent a sexually hostile culture.

4.     All of the above Defendants are responsible for creating a sexually dangerous environment, where students are unsafe on campus and the requirements of Title IX are ignored.  This is aptly described in the May 14, 2021, sworn Affidavit of Delta Tau Delta ("DTD") fraternity Executive Board Member Devin Hammond who swears to the lack of investigation and guidance by Defendant Werner after notice was given to her about a sexual assault by a fraternity member (Will Bujaki) in the fall of 2018. Mr. Hammond states in part the following:

> a.  "In November of 2018, I learned that the female student described above, reported her rape to the EMU Title IX Department and Melody Werner."
>
> b.  "At no time did Melody Werner contact anyone from the Board to inquire about the party or details of the allegations."

    c.  "Likewise, neither the EMU Title IX Department nor Melody Werner provided any information to assist the DTD Executive Board with handling allegations of Bujaki's rape."

    d.  Based on the failure of EMU, and in particular Defendant Werner, the DTD Executive Board was not provided with relevant information which would have impacted the DTD Executive Board's decisions regarding Mr. Bujaki. As a result, Bujaki had no restrictions and was observed engaging in a number of activities following the October 2018 sexual assault, including but not limited to:

        i.  Inviting women to the DTD fraternity house, including his bedroom and fraternizing with them without limitation.

        ii.  Supplying alcohol to minors at DTD social events, and

        iii. Supplying alcohol at the DTD house wherein he often became unruly and belligerent.

    e.  "In late 2018 or early 2019, I learned that Bujaki had raped another female student in November of 2018." (See attached affidavit, Exhibit 1).

5.     Plaintiffs are five former and/or current EMU students who were victims of sexual misconduct by EMU students. As the facts of this Complaint will set out, all of these sexual assaults would have been prevented had Defendants fulfilled its duties to protect Plaintiffs.

6.     For at least seven years, EMU has purposely failed to investigate credible reports of sexual assault, aggressively discouraged victims from filing complaints, and misled victims into believing that their assaults were isolated incidents instead of acts perpetrated by repeat offenders. In so doing, EMU

intentionally concealed from Plaintiffs its central role in perpetuating a rape culture at EMU as well its own legal culpability.

7.    Upon information and belief,[1] over 30 survivors of rape have come forward since March 25, 2021, upon learning that, from at least 2014 to 2020, EMU officials, including Defendants EMUPD and Melody Werner:

   a.    Manipulated or misled survivors of sexual assault;

   b.    Prevented survivors of sexual assault from acquiring information disclosing a right of action;

   c.    Failed to report sexual assaults in compliance with the Clery Act;

   d.    Failed to investigate the assaults pursuant to the mandates of Title IX;

   e.    Discriminated against countless victims of rape by singling them out and aggressively discouraging them from reporting; and

   f.    Wholly misrepresented the legal process to victims.

8.    Between 2014 and 2020, EMU, turned a blind eye to the individuals who made credible reports of sexual assaults, and - even worse - they ignored the fact that many of these reports identified a cadre of serial rapists.

9.    For example, law enforcement has charged former EMU student and member of Defendant Alpha Sigma Phi Dustyn Durbin with sexually

---

[1] Each paragraph herein is made "on information and belief."

assaulting/molesting 11 young women. These cases have proceeded through the preliminary exam stage and have been bound over to Circuit Court. [2]

10.     Many of these rapes took place on EMU's campus, EMU's fraternities' premises, or subsequent to the consumption of alcohol at fraternity and/or EMU-sanctioned events. Many EMU officials failed to fulfill their duties to report the sexual assaults as detailed below.

11.     More specifically, Defendants are responsible for Plaintiffs' damages stemming from the sexual assaults by former EMU students including Nigel Kilby ("Kilby"), Jason Ascencio ("Ascencio"), Noah Denniston ("Denniston"), and Brianna Burns ("Burns").

12.     Defendants placed vulnerable students like Plaintiffs in harm's way by 1) covering up several earlier reports of sexual assault, despite knowing the same were continuing, thereby creating an ongoing and increased risk of danger for EMU's students; 2) acting in a manner that was deliberately indifferent to the knowledge of reported and suspected sexual assaults against EMU's students; 3) failing to follow Defendant Regents Title IX policies and/or protocols; 4) failing to sufficiently train EMU staff and/or related personnel to properly investigate sexual assaults, and 5) committing overt acts of misfeasance and malfeasance. In essence, Defendants effectively and repeatedly provided Plaintiffs' assailants with a "Get Out

---

[2] *See Washtenaw County Circuit Court Case No. 20-000503-FC.*

of Jail Free" card. In doing so, Defendants continued to perpetuate the image of EMU and Greek life at EMU as a safe place for young students to reside and earn a diploma.

### *Defendant Melody Werner Had Actual Notice of Sexual Assaults*

13.   Defendants Werner is a mandatory reporter of all claims of sexual misconduct. In fact, Defendant Werner had a duty to ensure that all proper reports were made and kept in compliance with federal statutes designed to monitor campus safety. (Clery Act 20 U.S.C. sec 1092(f) (2018)).

14.   EMU officials, including but not limited to Defendants Werner and EMUPD, ignored the mandate set in place by Defendant EMU Board of Regents pursuant to Title IX that all employees and volunteers must report incidents of sexual assaults to proper authorities.  This mandate was enacted, in part, for the purpose of preventing sexual assaults.

15.   Upon information and belief, Defendant Werner would aid and assist the assailants when they were facing sexual assault claims by inappropriately meeting with them to go through their version of events and providing special accommodations not similarly advanced to the victims.

16.   Defendant Werner skewed the sexual assault statistics in EMU's Clery Act Report, which mandates reporting of crimes that occur on and off campus.

17.     Defendant Werner frequently and deliberately failed to memorialize reports of sexual assault. Further, upon information and belief, Defendants knowingly conspired and aided with each other to not follow the mandated reporting protocol.

18.     It was well-known by Defendant Werner that members in Greek Life were at a heightened risk of underage drinking and sexual misconduct.

19.     EMU policy mandates that officers of fraternities and sororities are deemed mandated reporters of sexual assault.

20.     Upon information and belief, Defendant Alpha Sigma Phi maintained policies and procedures requiring their members to report any and all instances of alleged sexual assault to EMU's Title IX department.

21.     Upon information and belief, Defendant Alpha Sigma Phi members knew about many of the rapes.

22.     Upon information and belief, beginning in at least December 2016, Defendant EMU Police Department ("EMUPD") had knowledge of systemic rapes and/or sexual assaults that had taken place at EMU and in the surrounding area and failed to take adequate steps to protect victims and further failed to adhere to Title IX policies and procedures.

23.    Another harrowing example of EMUPD's total disregard of a sexual assault involved a female EMU student (hereinafter referred to as "Jane Doe 0" although she is not one of the Plaintiffs) who was sexually assaulted in 2016.

24.    Her contact with EMUPD serves as a glaring example of Defendants failing to protect students from – as well as purposefully concealing from students – EMU's systemic rape culture as accounted below:

    a.  Resident Advisor in an EMU dormitory called 911 to report a female screaming;

    b.  Defendant EMUPD responded finding EMU student and Alpha Sigma Phi member Dustyn Durbin with Jane Doe 0, who was in a shower with the water running, half-dressed and unresponsive; Jane Doe 0 regained consciousness and suddenly started saying "please, please, please." She then blurted out "keys, keys...pants, penis, penis;"

    c.  Jane Doe 0 was transported to the hospital and was later contacted by Defendant EMUPD, while still at the hospital, at which time she could not recall what had happened to her;

    d.  A CSC kit was not administered on Jane Doe 0;

    e.  An hour before Defendant EMUPD arrived, members of Defendant ASP - Chapter had taken an unconscious Jane Doe 0 to the dormitory room, and it was during that hour Durbin sexually assaulted Jane Doe 0; and

    f.  Defendant EMUPD failed to properly investigate the sexual assault of Jane Doe 0. In a subsequent police investigation, Durbin, upon information and belief, admits to having sex with Jane Doe 0.

13

25.     Defendant EMUPD failed to report Jane Doe 0's sexual assault to EMU's Title IX department in violation of both EMU policies4 and Title IX requirements.

26.     No Title IX investigation took place.

27.     Instead, Defendant EMUPD issued Jane Doe 0 a citation for underage drinking and leveled no charges against Durbin. It was not until four years later in 2020 that Durbin, was finally charged with multiple counts of sexual assault perpetrated against nine EMU students between 2015-2019.[3]

28.     Upon information and belief, a glimpse into the culture of EMUPD was captured by Defendant EMUPD Deputy Chief Daniel Karrick's ("Karrick") attempt to explain Title IX to Ypsilanti Police Department Detective Annette Coppock ("Coppock"), the officer in charge ("OIC") of the criminal investigation against several of the alleged EMU rapists: **"…If you have a campus that has a lot of rapes or guys that are catcalling girls or that type of culture, 'No' means 'yes' and 'yes' means 'anal,' then Title IX comes into play to say this is not a safe school for girls to be attending because they cannot get an equal opportunity to get an education with this type of stuff going on."**

---

[3] See https://www.freep.com/story/news/local/michigan/2020/10/14/sex-assaults-eastern-michigan-university-dustin- durbin-trial/3643539001/.

## PARTIES

29.     Plaintiffs JANE DOE 20, JANE DOE 21, JANE DOE 22, JANE DOE 23, and JOHN DOE 24  (hereinafter collectively referred to as "Plaintiffs" unless otherwise identified) reside and/or at all times relevant to the instant action resided in the State of Michigan within the Eastern District of Michigan.

30.     At all times relevant to the instant action, Plaintiffs were students at EMU located within the Eastern District of Michigan.

31.     Plaintiffs file this case anonymously because of the extremely sensitive nature of the case as Plaintiffs were victims of sexual assault, and the suit will require disclosure of information "of the utmost intimacy;" Plaintiffs are therefore entitled to protect their identities in this public filing by not disclosing their names.  *Doe v. Porter,* 370 F.3d 558, 560 (6th Cir., 2004), citing *Doe v. Stegall*, 653 F.2d 180, 185-86 (5th Cir., 1981).

32.     Defendant EMU BOARD OF REGENTS ("Regents") is the governing body of EMU, a public university and Michigan Corporation that receives Federal financial assistance and is, therefore, among other reasons, subject to Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, *et seq*., and is a body corporate, with the right to be sued., MCL 390.551, *et seq*.

33.     At all times relevant to the instant action, Defendant MELODY WERNER ("Werner") resided in the Eastern District of Michigan and was EMU's Title IX Coordinator.

34.     Defendant Werner is being sued in both her individual and official capacity.

35.     At all relevant times to the instant action, Defendant Werner was acting in her official capacity, within the course and scope of her employment as EMU's Title IX Coordinator, employed by EMU and Defendant Regents, and under color of law.

36.     Defendant EMUPD a.k.a. EMU Department of Public Safety, with its principal location at 1200 Oakwood Street, City of Ypsilanti, County of Washtenaw, State of Michigan, is located within the Eastern District of Michigan.

37.     At all times relevant to the instant action, Defendant EMUPD was deputized by the Washtenaw County Sheriff, expanding Defendant EMUPD's jurisdiction beyond the borders of EMU's campus as a part of the Eastern Washtenaw Safety Alliance and in collaboration with the Washtenaw County Sheriff's Office, YPD, and the Ann Arbor Transportation Authority. The officers from each agency within the Eastern Washtenaw Safety Alliance, including Defendant EMUPD, share jurisdictional authority and have county-wide arrest powers.

38.     At all times relevant to the instant action, Defendant Karrick resided in the Eastern District of Michigan and was employed by Defendants EMUPD and Regents as EMUPD's Deputy Chief of Police.

39.     Defendant Karrick is being sued in his official capacity and his individual capacity.

40.     At all times relevant to the instant action, Defendant Karrick was acting in his official capacity, within the course and scope of his employment as EMUPD's Deputy Chief of Police, employed by Defendants EMUPD and Regents, and under color of law.

41.     At all times relevant to the instant action, Defendant Heighes resided in the Eastern District of Michigan and was employed by Defendants EMUPD and Regents as the EMUPD Chief of Police.

42.     Defendant Heighes is being sued in his official capacity and in his individual capacity.

43.     At all times relevant to the instant action, Defendant Heighes was acting in his official capacity, within the course and scope of his employment as EMUPD Chief of Police, employed by Defendants EMUPD and Regents, and under color of law.

44.     Defendant ASP FRATERNITY, INC. ("ASP – National") is a foreign corporation which conducts business in the City of Ypsilanti, County of Washtenaw, State of Michigan.

45.     Defendant ASP – Gamma Upsilon Chapter ("ASP – Chapter"), is a Michigan corporation with its location at 411 Ballard Street, City of Ypsilanti, State of Michigan, and is located within the Eastern District of Michigan.

## JURISDICTION AND VENUE

46.     This Court's subject matter jurisdiction is based on 28 USC §§ 1331 and 1343 as the action arises under the United States Constitution and seeks damages under Acts providing for the protection of civil rights pursuant to 42 USC §1983 and other statutes, including Title IX, 20 USC §1681.

47.     This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to Fed. R. Civ. P. 18 and 28 U.S.C. § 1367.

48.     This is an action for creating, fostering and failing to remedy a known sexually hostile environment and failure to protect students in violation of Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681, *et seq*., 34 C.F.R. § 106.31 *et seq*., 42 U.S.C. § 1983, and the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act of 1990, 20 U.S.C. § 1092(f) (2018) ("Clery Act").

49.     Defendants are not immune from suit under the Governmental Tort Liability Act, MCL 691.1401 *et seq*., or any other statute.

50.     Venue is proper in the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b), as all of the events giving rise to this action occurred in the County of Washtenaw, State of Michigan, which is located within the Southern Division of the Eastern District of Michigan.

51.     The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), excluding interest, costs, and attorney fees.

52.     Plaintiffs' Complaint is timely filed within the applicable statutes of limitations.

## **TITLE IX**

53.     Title IX is inherently designed to protect and ameliorate the effects of sexual harassment, sexual assaults and other misconduct.

54.     EMU, as a federal loan recipient and participant in Title IV of the Civil Rights Act of 1964, is required to comply with federal law, including Title IX.

55.     Title IX prohibits gender-based misconduct, which may include acts of verbal or nonverbal communication or conduct, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping, regardless of whether those acts include conduct of a sexual nature.

56.     A school is responsible under Title IX for the sexual misconduct of a student by another student (i.e., peer sexual harassment) when the school remains deliberately indifferent to severe, pervasive or objectively offensive sexual conduct of which it has actual knowledge.

57.     Under Title IX, a school remains deliberately indifferent to harassment where its response is clearly unreasonable in light of the known circumstances. Evidence of deliberate indifference can include the failure to provide academic accommodations and the failure to adequately discipline the harassing student.

58.     The deliberate indifference standard makes a school liable when, among other things, it refuses to take action to bring the recipient into compliance.

59.     A school is responsible to take prompt and equitable remedial measures, including interim measures reasonably designed to deter retaliation during investigations and promptly advising survivors of credible threats to their safety during the investigatory process[4].

60.     It is a violation of Title IX for a school to delay action until after survivors have graduated simply to avoid disruption.

61.     Defendants had actual knowledge of EMU's Title IX department's deficiencies and the lack of trust in the same by its student body.

---

[4] See Page 39 of Title IX Coordinator and Administrator Level One Training and Certification Course; https://www.emich.edu/title-nine/documents/professional-development/atixa-title-ix-coordinator-certification-training.pdf?v=2021-01-29T18:00:51Z

62. Defendants' acts and failures to act, as it relates to each Plaintiff, constitute unlawful discrimination on the basis of gender. The sexual misconduct endured by each Plaintiff was sufficiently severe, pervasive, and objectively offensive to constitute "actionable harassment." One or more of EMU's administrators, agents, and/or officials, with authority to take corrective action on Plaintiffs' behalf, had actual knowledge of the sexual assaults of Plaintiffs but discriminated and/or failed to adequately respond in accordance with their own policies in light of the surrounding circumstances. These clearly unreasonable responses amounted to deliberate indifference toward the foreseeable possibility of further actionable harassment of each Plaintiff. As a result of Defendants' acts or failures to act, each Plaintiff was subjected to subsequent harassment and loss of educational opportunities, resources, and/or benefits.

63. Additionally, EMU failed to implement proper procedures to discover, prohibit or remedy the kind of gender-based discrimination that each Plaintiff suffered. These failures included non-existent or inadequate policies or procedures for the recognition, reporting, investigation, and correction of unlawful gender-based discrimination, as well as the failure to properly assess and monitor the operation of Greek Life; the failure to report allegations of sexual misconduct to law enforcement and/or relevant EMU administrators; the policy and/or practice of engaging in ad-hoc, internal disciplinary procedures that resulted in a lack of discipline for members

of fraternities that engaged in sexual misconduct; the policy and/or practice of discrediting victims of sexual assault, abuse and/or misconduct; the policy and/or practice of tolerating and/or tacitly approving sexual misconduct committed students and guests of EMU; and the creation of a sexually hostile atmosphere whereby the rules applicable to all students did not apply to certain students. Defendants acted with deliberate indifference in response to knowledge of institutional, serial rape. Even worse, Defendants intentionally and fraudulently concealed their knowledge of sexual assaults and/or sexual misconduct committed by members of EMU fraternities and other EMU students and guests.

64.     As early as 2014, Defendants had actual notice of sexual assaults perpetrated by EMU students, including but not limited to fraternity members, but acted with deliberate indifference to the foreseeable possibility of further actionable harassment, in part, by failing to take prompt and reasonable actions in response to this knowledge, thereby subjecting Plaintiffs to subsequent harassment which ultimately deprived Plaintiffs of educational opportunities, resources, and/or benefits.

65.     Defendants acted with deliberate indifference in deviating significantly from the standard of care outlined by the Department of Justice in the Dear Colleague Letter of 2011, and contrary to their own policies.

66.     As a result of Defendants' deliberate indifference, Plaintiffs were forced to endure further actionable harassment and a sexually hostile environment on campus. In addition, Plaintiffs suffered losses of educational opportunities and/or benefits and incurred, and will continue to incur, attorney fees and other costs of litigation.

67.     At all times relevant hereto, Plaintiffs were unaware of Defendants' pervasive failings with respect to their response to known issues of sexual misconduct within EMU's student-body dating back several years prior to the sexual assaults endured by these Plaintiffs. Because Defendants concealed this information from Plaintiffs and the general public, Plaintiffs could not, with reasonable diligence, have learned this information independently.

68.     At all times relevant hereto, Plaintiffs were unaware of Defendants' deliberate indifference to the actual knowledge that members of EMU's fraternities and other EMU students had been accused of sexually assaulting EMU students and guests, thereby constituting an institutional and pervasive pattern of sexual misconduct of which Defendants were aware. Because Defendants concealed this information and failed to report the same, contrary to the Clery Act, Plaintiffs could not, with reasonable diligence, have discovered this information independently.

69.     At all relevant times hereto, Defendants did not use their best efforts and, in fact, acted in bad faith in response to Plaintiffs' claims of sexual assaults.

**_Mandated Reporting of Sexual Misconduct on EMU Campus by Greek Life_**

70.     Defendant ASP - Chapter played a role in condoning and enabling a culture of sexual assaults on EMU's campus.

71.     At all times relevant to the instant action, each Greek Life Chapter organization had a corresponding National organization, which are also Defendants, that governed, controlled and/or managed their respective local chapters through bylaws, constitutions and/or codes of conduct regarding all matters, including but not limited to incidents of harassment and sexual assault.

72.     Defendant ASP – Chapter has specific bylaws governing its operation and management.

73.     Defendant ASP – Chapter's bylaws require it to do the following:

    a.     Appoint a Risk Management Director, whose duties and obligations include but are not limited to:

        i.     "Reduce exposure to risk and liability of the Chapter and its members;"

        ii.     "Ensure that risk management policies are followed at all Chapter events;"

        iii.     "Communicate at least monthly with the Risk Management Advisor on the Chapter Council;"

        iv.     "Assist the President and Prudential Board with crisis management;"

        v.     "Work with the House Manager to ensure proper health, safety and welfare inspections are carried out…;"

      vi.      "Coordinate at least one educational program related to risk management each term;"

      vii.     "Complete an incident report and submits to Headquarters for all incidents," and

      i.      "Document everything and prepare a transition binder to pass on to the next officer."

b.     Adopt a Risk Management Program that, among other things:

      i.      "Aims to reduce risk;"

      ii.     Helps "undergraduate members of the fraternity better understand that 'risk' is a part of life and that given the tools and resources to recognize 'risk' and individuals' liability and be greatly reduced;"

      iii.    Informs "members of all applicable federal, state, and local laws, as well as college or university and national fraternity policies," including but not limited to EMU's Title IX policies;"

      iv.    "Makes sure that all Chapter policies are consistent with federal, state, and local laws, as well as college or university and national fraternity policies;"

      v.     "Ensures that every Chapter activity is evaluated for potential risks and that all possible actions are taken to manage such risks;"

      vi.      "Develops and maintains a crisis management plan and make sure each Chapter member is familiar with the actions contained within the plan;" and

      vii.     "Educates members on the ASP National Fraternity's alcohol policies."

c.     Ensure that every appointed officer "leads by example."

74.     Defendant ASP – Chapter also enacted a "Code of Conduct" by which all members must abide, which includes but is not limited to, the following affirmations:

> a.     "I will respect the dignity of all persons, and therefore, I will not physically, psychologically, or sexually abuse any human being;" and
>
> b.     "I will not abuse, nor support the abuse of, alcohol or controlled substances."

75.     Defendant ASP – Chapter further follows a Health and Safety Policy which explicitly provides that "[t]he Fraternity will not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional.  This is to include any actions, activities, or events, whether on chapter premises or an off-site location which are demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together."

76.     Every member of Defendant ASP – Chapter must sign a "Membership Agreement and Affiliation Form" which includes, but is not limited to, the following acknowledgements:

> a.     "To follow and comply with all policies and procedures as outlined in the Fraternity Constitution and By-laws, …, the chapter/provisional chapter Constitution and By-laws; and the Ritual of Alpha Sigma Phi Fraternity;"

26

      b.      "To familiarize myself with and comply with Alpha Sigma Phi Health and Safety Policies… These Policies forbid any form of hazing or assault;" and

      c.      "To comply with the laws of the land and rules, regulations and policies of the institution where I am enrolled as a student," including but not limited to EMU's Title IX policies.

77.    At all times relevant to the instant action, Defendant ASP – National governed, controlled and/or managed Defendant ASP – Chapter via its bylaws, constitution and/or code of conduct.  Defendant ASP – Chapter is required to regularly report to Defendant ASP – National regarding all matters, including but not limited to incidents of harassment and sexual assault.

78.    Defendant ASP – National was on notice of Defendant ASP – Chapter's probationary status for previous violations, including, but not limited to, alcohol consumption on its premises in direct violation of its bylaws.

79.    Officers and members of Defendants ASP – Chapter were all duty-bound and obligated to ensure that all sponsored events included certain safety protocols including assigning a member to serve as a "sober monitor". This was rarely done and often if a "sober monitor" was put in place they were intoxicated.

80.    Defendants ASP – Chapter and National ("Defendant Fraternities") would encourage and pressure students to drink excess amounts of alcohol at sanctioned events.

81.     Defendant Fraternities, through their members and officers, aided and abetted the hazing, bullying, coercing, and furnishing alcohol to minors and/or vulnerable EMU students, encouraging them to become intoxicated at parties and rendering them vulnerable to fraternity members who were both unmonitored and encouraged to assault women.

### *Fraudulent Concealment of Sexual Misconduct on EMU's Campus*

82.     Plaintiffs' claims are timely filed as Defendants hid from Plaintiffs the legal claims they had against Defendants. Defendants' fraudulent concealment of Plaintiffs' claims in this fashion tolled the applicable statute of limitations.

83.     For many years, Defendants have carefully concealed their role in creating and fostering a pervasive rape culture at EMU, so much so that it was not until the filing of a related Complaint on March 25, 2021 that the existence of legal claims against Defendants was discovered.

84.     When a Defendant fraudulently conceals the existence of a legal claim from the knowledge of the person entitled to sue, the statute of limitations is tolled as follows:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers or should have discovered, the existence of the claim or the identity

of the person who is liable for the claim, although
the action would otherwise be barred by the period
of limitations. MCL § 600.5855.

85. Here, Defendant Regents, through the bad acts of its officers and employees, fraudulently concealed the existence of legal claims from the Plaintiffs as set forth fully throughout this Complaint.

86. Plaintiffs did not discover the wrongful conduct of Defendants Regents, EMUPD, Werner, Heighes and Karrick, all of whom concealed causes of actions that Plaintiffs may have had against Defendants until at least March 25, 2021. It was not until that date when it was discovered that EMU Defendants (Werner, Karrick, Heighes) had engaged in wrongful conduct by concealing their knowledge of years of ongoing criminal conduct at EMU. Likewise, it was not until March 25, 2021 when it was discovered that for many years Defendants failed to report and/or investigate credible reports of "Prohibited Conduct" (as defined in **EMU's Sexual Harassment and Interpersonal Violence Policy**) thereby concealing the existence of viable legal claims from Plaintiffs and enabling this horrendous activity to continue for years.

87. Under section V of EMU's "3.7.7 Sexual Misconduct and Interpersonal Violence Policy" (effective July 1, 2016), "[a] **Responsible Employee** is required to **immediately report** to the **University's Title IX Coordinator and DPS** all relevant details **(obtained directly or indirectly)** about an incident of **Prohibited**

Conduct that involves **any member** of the EMU community ("**students**", "employees" and "**third parties**") as a Complainant, Respondent, and/or witness." (Emphasis added). **"Responsible Employees are all EMU employees except Confidential Employees . . . Responsible Employees include Resident Advisors, Graduate Assistants, and all other student-employees, when disclosures are made to any of them in their capacities as employees."** (Emphasis added).

88.    Defendants cannot avoid application of the fraudulent concealment statute by arguing that they did not directly make any fraudulent statements to Plaintiffs in an effort to conceal Plaintiffs' causes of actions against them because EMU had actual knowledge of the concealment and an affirmative duty to disclose to Plaintiffs the wrongful conduct based on fiduciary relationships with Defendants' students.

89.    Defendants also owed a heightened duty of care to Plaintiffs, some of whom were under the legal drinking age, and others who were provided alcohol by members of ASP – Chapter and others and then sexually assaulted.

90.    Defendants had a duty to warn and a duty to protect Plaintiffs and all students enrolled at EMU.

91.    Defendants, through their employees, agents, and representatives fraudulently concealed the existence of Plaintiffs' claims by 1) concealing from Plaintiffs, and those similarly situated, EMU's systemic culture of sexual assaults

and/or sexual misconduct 2) concealing the same from Title IX reporting in order to preserve federal funding, 3) concealing from Plaintiffs that EMU and its employees, agents and representatives were aware of the culture of sexual abuse and failed to make a good-faith effort to stop and/or prevent it, 4) affirmatively telling Plaintiffs that their claims were not actionable at law, and 5) publishing a statement, which was presented to and relied upon EMU students, including but not limited to Plaintiffs, explaining that anonymous reporting to any "responsible employee" was sufficient to put Defendants on actual notice of sexual misconduct.

### ***Defendant Melody Werner's Fraudulent Concealment.***

92.    Defendant Werner made affirmative representations (hereinafter "Werner's representations") to Plaintiffs as follows:

     a.  That Plaintiffs' claims lacked sufficient evidence to initiate a formal investigation;

     b.  That Plaintiffs' complaint of sexual assault was an isolated incident;

     c.  That Plaintiffs' assailant had no previous report of assault;

     d.  That Plaintiffs would not be believed;

     e.  That reporting the assault would negatively impact the Plaintiffs;

     f.  That protective measures from further assaults were not available to Plaintiffs, such as No Contact Orders and escorts;

     g.  That Plaintiffs should not pursue formal investigations following their sexual assaults;

     h.  That Plaintiffs were not sexually assaulted;

i.  That Plaintiffs should not question and/or report the conduct to appropriate authorities; and,

j.  That there was no possible cause of action against their rapist and/or EMU.

93.  Defendant Werner's representations were false.

94.  Defendant Werner knew the representations were false. She intentionally misled students who had been sexually assaulted to not pursue further action. Upon information and belief, this was done to create a façade that EMU was free of sexual assaults in order to maintain funding.  Defendant Werner knew her response to reported sexual assaults of Plaintiffs by an alleged serial rapist and others were not proper, appropriate, legitimate, reasonable and/or in accordance with federal Title IX guidelines.

95.  Defendant Werner made the false representations even though she was aware of the campus culture of sexual assaults.

96.  Defendant Werner aggressively discouraged victims from reporting their rapes during face-to-face meetings, and later sent "follow-up" emails to Plaintiffs in order to create a paper trail of an alleged appearance of "compliance."

97.  Defendant Werner's representations to each Plaintiff that they were not assaulted and/or that the incident they were involved in was not worth reporting, purposefully led each Plaintiff to believe - as Defendant Werner intended - that their assault was an isolated incident. However, in reality, Defendant Werner and others

32

at EMU, instead concealed their knowledge about the pervasive rape culture at EMU, creating a very dangerous environment for vulnerable students, like the Plaintiffs.

98. Defendant Werner's representations were material, in that had Plaintiffs known the representations were false, Plaintiffs would have known about EMU's culpability and direct role in their assault.

99. Defendant Werner's representations and discouragement of victims from reporting their sexual assaults were made knowingly, as Defendant Werner, in a position of power and authority over these victims, knew that that Plaintiffs would rely on any representations that she made. Plaintiffs by and large relied on Defendant Werner's counsel and advice. Defendant Werner's statements were made with the intent of concealing from Plaintiffs that they had a viable cause of action against EMU, its employees, agents, and/or representatives.

100. Plaintiffs relied upon Werner's representations causing Plaintiffs to discontinue efforts to pursue legal remedies and protections from sexual assaults, resulting in Plaintiffs experiencing further harassment and a deprivation of educational benefits, resources and opportunities.

101. Werner's false representations amount to fraud and were made for the purpose of concealing the truth, which was that Plaintiffs had/have a cause of action against Defendants.

102.   Defendant Werner further concealed the fraud by taking affirmative steps to avoid inquiry or investigation into EMU's rape culture when she failed to abide by or follow proper Title IX protocol related to reports of sexual misconduct committed by the same assailant(s).   Specifically, Defendant Werner, when confronted with multiple reports of sexual misconduct by the same assailant, intentionally discouraged and/or declined to investigate patterns of sexual misconduct by repeat assailants, which constituted an institutional pattern of sexual misconduct on EMU's campus.

103.   At all times pertinent to this action, Defendant Werner was an agent, apparent agent, servant, and employee of EMU and operated within the scope of her employment, and her fraudulent concealment is imputed to EMU.

104.   Accordingly, the statute of limitations on Plaintiffs claims against EMU have been tolled by Defendant Werner's fraudulent concealment.

### *All Defendants' Fraudulent Concealment.*

105.   Defendants, through their employees, agents, and representatives, including but not limited to Defendants Werner, EMUPD, and members of EMU's administration, made affirmative representations to Plaintiffs (hereinafter "Defendants' representations") to Plaintiffs as follows:

a.   That Plaintiffs' claims lacked merit;

b.   That members of EMU's Greek Life would be believed and

trusted in favor over Plaintiffs;

c.    That Plaintiffs, by virtue of their clothing, makeup or general appearance, must be promiscuous;

d.    That Plaintiffs would not be believed because their accounts of sexual assault did not align with their accusers' "stories";

e.    That Plaintiffs would have to undergo an arduous process to report and proceed with a Title IX claim;

f.    That Plaintiffs were led to believe that the Ypsilanti Police Department would not investigate their claims due to lack of evidence; and,

g.    That there was no possible cause of action against their rapist and/or EMU.

106.   Defendants' representations were false.

107.   Defendants knew the representations were false. Defendants received several complaints since, at least, 2014 about sexual assaults prior to Plaintiffs' reports.

108.   Defendants made the material representations, knowing they were false and/or made the material representations recklessly, without any knowledge of their truth and as a positive assertion, in that they had previously received strikingly similar complaints of abuse by EMU students and members of Greek Life from other students and knew that the EMU Title IX department's responses to such allegations had been completely inadequate.

109.   Defendants' representations were material, in that had Plaintiffs known the representations were false, they would have sought alternative action immediately.

110.   Defendants' representations were made with the intent that Plaintiffs would rely on them as Defendants sought to prevent Plaintiffs from discovering they had a cause of action against Defendants.

111.   Plaintiffs did, in fact, rely on Defendants' representations; indeed, the representations led Plaintiffs to refrain from seeking formal resolution and, had they known the representations were false, Plaintiffs would have sought formal resolution.

112.   Defendants knew that Plaintiffs were particularly susceptible to believing Defendants' misrepresentations because:

   a.   Plaintiffs were young and impressionable;

   b.   Defendants' representations were made within the context of a pervasive culture created by EMU that supported that Defendant Werner's advice was sound and binding, and she was a competent Title IX coordinator to be trusted and never questioned;

   c.   Plaintiffs had no prior experience with legitimate and appropriately pursued claims involving sexual assault, so it was impossible for Plaintiffs to differentiate a legitimate and appropriately performed Title IX response from a clearly unreasonable response;

   d.   Plaintiffs respected Defendant Werner's notoriety, status and position of authority over them, and thereby trusted, relied and

believed her representations;

e.      Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action because they were young students who were not knowledgeable or aware of the civil justice system and applicable remedies at law; and,

f.      Plaintiffs had never previously heard about allegations in the media or on campus regarding sexual assaults or misconduct by students and Greek Life members at EMU, as the truth had been concealed from them and there were no such reports.

113.   Accordingly, Plaintiffs did not know, could not have reasonably known, and were reasonably unaware of a possible cause of action that they had against Defendants until the filing of a related Complaint on March 25, 2021, at which point Plaintiffs discovered possible causes of action against Defendants.

114.   In addition to affirmative false representations, EMU officials, agents, and representatives failed to disclose to Plaintiffs that they were victims of a culture of ongoing and pervasive sexual assaults.

115.   At all times pertinent to this action, the Title IX employees, staff, supervisors, and directors of Defendants were agents, apparent agents, servants, and employees of Defendants and operated within the scope of their employment and their Fraudulent Concealment is imputed to Defendants.

116.   Defendants committed Fraudulent Concealment, as described in detail above and below.

117. For plaintiffs who were initially minors when assaulted, Michigan law also provides a safe harbor from statute of limitations in MCL 600.5851b.

118. Beginning in at least December 2014, Defendant EMUPD had knowledge of the rape culture at EMU and the prevalence of sexual assaults on EMU's campus and in the surrounding area.

119. Defendant EMUPD officers and/or investigators deliberately failed to enter reports from sexual assault victims into the police CRISnet system and/or other Defendant EMUPD reporting systems and/or software utilized by Defendant EMUPD to create police reports from complaining victims and/or witnesses.

120. Defendant EMUPD deliberately failed to notify the Ypsilanti Police Department ("YPD") about the brutal rapes against Plaintiffs that reportedly occurred within YPD's jurisdiction. As will be explained more thoroughly herein, Defendants Regents and EMUPD concealed the assaults from YPD for nearly two years, and thus thwarted a proper investigation into Plaintiffs' sexual assault which resulted in catastrophic psychological and physical harm to them, as well as Defendant Regents and EMU's community as a whole.

121. YPD did not become aware of several sexual assaults to Plaintiffs until 2020 whereupon it initiated and conducted a thorough investigation.

122. Accordingly, Plaintiffs did not know, could not have reasonably known, and were as reasonably unaware of possible causes of action that they may

have against Defendants until they heard about complaints filed against EMU students and Greek Life members for sexual assaults, at which point Plaintiffs became aware that EMU indirectly or directly caused the abuse by being aware that there was a culture of sexual predators and failing to stop them from harming students.

123.   Plaintiffs incorporate by reference the paragraphs above and below regarding damages suffered by Plaintiffs as a result of Defendants' responsibility for their conduct and permitting a cultural of sexual assaults to be prevalent on its campus, Defendants' awareness and responsibility for their fraudulent misrepresentations about the Title IX process, reports of sexual assaults, and/or Defendant Werner's fraudulent misrepresentations.

## FACTUAL ALLEGATIONS

124.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

## JANE DOE 20

125.   JANE DOE 20 enrolled at EMU in the Fall of 2016.

126.   JANE DOE 20 and Nigel Kilby, an EMU student athlete, were involved in a relationship from approximately November 2016, until approximately January of 2017, when JANE DOE 20 ended their relationship due to Kilby's infidelity.

### *EMU's Actual Notice of Kilby's Prior Sexual Misconduct*

127.   Upon information and belief, Kilby was suspended from EMU for a period of one year due to a determination by EMU's Title IX department on or about November 2016 that Kilby had committed sexual misconduct on or about August 2016, against a female EMU student ("Jenn Doe"), in violation of EMU's Sexual Misconduct and Interpersonal Violence Policy.

128.   Upon information and belief, on or around November 2016, Defendant EMU had actual notice that Kilby had violated a no contact order, which was issued pursuant to the investigation of Jenn Doe's reported sexual assault.

129.   Upon information and belief, after notice of his violation, EMU suspends Kilby from EMU's campus for one calendar year that was not enforced until January 2017.

130.   Upon information and belief, EMU nonetheless permitted Kilby to retain his student access pass to all dorms on EMU's campus.  Upon further information and belief, this access pass can be remotely deactivated at any time by EMU.

131.   Upon information and belief, a student's access pass is deactivated when, among other things, that student is suspended.

132.   Despite having evidence that Kilby had violated the terms of his no-contact order, EMU permitted Kilby to maintain access to EMU facilities, including but not limited to female dormitories.

### *Night of the Assault*

133.   On or about February 11, 2017, Kilby called JANE DOE 20 and told her he was coming to her campus apartment.  Upon information and belief, by this time, Kilby was roughly one month into serving his suspension.

134.   Aware of Kilby's suspension in response to sexual misconduct he committed against Jenn Doe, JANE DOE 20 told Kilby that he was not welcome and to leave.

135.   Kilby ignored JANE DOE 20's requests and instead sent her a picture of her apartment door moments later via Snapchat insinuating that he was not leaving until he got what he was coming for.

136.   Upon information and belief, Kilby used his still active EMU swipe-card to gain access to JANE DOE 20's apartment.

137.   Kilby told JANE DOE 20 he would not leave until she came outside to speak with him. Eventually, JANE DOE 20 acquiesced into speaking with Kilby in the hallway.

138.   JANE DOE 20 could smell the alcohol emanating from Kilby as they talked in the hallway.

139.   During their conversation, Kilby attempted to grab and kiss JANE DOE 20, making JANE DOE 20 uncomfortable. JANE DOE 20 tried to get up and go back into her apartment, but Kilby forcefully restrained her.

140.   Eventually, Kilby asked JANE DOE 20 if they could talk in her room instead of the hallway. JANE DOE 20 told Kilby that her roommate was inside and that he would have to ask her roommate. JANE DOE 20's roommate said "yes."

141.   JANE DOE 20 and Kilby talked for approximately two hours before Kilby again suddenly tried to kiss her mid-conversation. JANE DOE 20 became even more uncomfortable.

142.   JANE DOE 20 told Kilby "I don't want to do that. We are just friends now." Kilby, in return, became visibly upset that JANE DOE 20 would not kiss him.

143.   After JANE DOE 20 denied Kilby's advances, she walked out of the bedroom to get something to drink and go to the bathroom.

144.   Upon her return, JANE DOE 20 saw Kilby standing over her desk chair soon realizing he had an erection and had draped his hoodie over his penis to conceal it.

145.   JANE DOE 20 immediately told Kilby he had to leave, but Kilby argued he had no place to go.

146.   Kilby instead, asked JANE DOE 20 to give her a hug and then suddenly grabbed her, pulled her in, and began groping, hugging, and kissing JANE DOE 20 against her will. She repeatedly told Kilby to stop and tried to resist, but Kilby had wrapped his arms around JANE DOE 20 to keep her from leaving.

147.   JANE DOE 20 attempted to pull herself away from Kilby's grip by using her roommate's desk to pull against.  However, due to the size disparity between JANE COE 20 and Kilby, she was powerless.

148.   JANE DOE 20 continued to try to fight and push away from Kilby, but soon realized the more she told him "No" and "Stop", the more aroused Kilby seemed to become.

149.   Kilby took one arm while holding JANE DOE 20 and attempted to pull her shorts down. JANE DOE 20 crossed her legs to stop Kilby from pulling her shorts down further.

150.   Kilby turned the desk chair sideways, forced her legs open with his hand, spit onto his hand, and penetrated her vagina with his fingers. Kilby was attempting to get JANE DOE 20 "wet" prior to his sexual assault.

151.   JANE DOE 20 continued to tell Kilby "no" and attempted to push him away, to no avail.

152.   Suddenly, Kilby picked up JANE DOE 20, turned her around, and placed her onto him while he sat on the desk chair penetrating her vaginally with his penis.

153.   JANE DOE 20 repeatedly told Kilby to "stop" as she tried to get away.

154.   Kilby, with JANE DOE 20 still on his lap, thrust her off the chair causing her to fall onto her hands and knees. Kilby continued to hold onto JANE

DOE 20's hips as she tried to grab furniture and get away. JANE DOE continued to plead "stop" multiple times.

155.   In the act of Kilby raping JANE DOE 20, Kilby grabbed his belt off the floor and wrapped it around JANE DOE 20's neck "like a leash." This caused JANE DOE 20 to drop to her elbows preventing her from breathing as Kilby continued to strangle her.

156.   Kilby pulled the belt tighter and tighter. JANE DOE 20 tried to grab the belt and used both hands attempting to loosen the grip. Kilby strangled her for 30-45 seconds.

157.   Kilby eventually let go of the belt to grab JANE DOE 20's hips, at which time JANE DOE 20 was able to free herself from the belt. She was finally able to take a breath.

158.   JANE DOE 20 grabbed the side of a desk and pulled herself up. JANE DOE 20 turned over, pulled her shorts up, and ran out of the room.

159.   Kilby attempted to grab her leg and stop her but she managed to escape into the bathroom.

160.   Once in the bathroom, JANE DOE 20 closed the door behind her, cleaned herself up, and began to sob uncontrollably.

161.   After a few minutes, JANE DOE 20 left the bathroom finding that Kilby was still in her room.  Astonishingly, Kilby looked at JANE DOE 20 and said, "What are you doing? We didn't finish."

162.   In shock and frozen, JANE DOE 20 sat on the floor and began crying. Kilby then said, "**oh my gosh, it's happening again**." Referring to a previous sexual assault allegation against him. Kilby then put his erect penis back into his pants.

163.   Kilby got up and put JANE DOE 20 on his lap as she hysterically cried in the fetal position.

164.   JANE DOE 20 realized Kilby was trying to comfort her and make her feel better about the situation by rubbing her back like a child. JANE DOE 20 jumped up off of Kilby's lap and went into the bathroom so she could clean her face.

165.   JANE DOE 20 left the bathroom and went into the kitchen to make food as Kilby continued to sit in her bedroom. After finishing her food, she walked back into her bedroom where she again found Kilby under the sheets in her bed. She instructed Kilby that he needed to leave.

166.   Kilby protested that he had nowhere to go and would need to stay. JANE DOE 20 told Kilby that she had contacted one of his friends and they were coming to pick him up.  JANE DOE 20 walked back into her living room and watched TV with her roommate until Kilby was picked up.

167.   As he was leaving, Kilby looked at JANE DOE 20 saying he did not know when they would see each other again and asked for a hug. JANE DOE 20 told him "Bye, get the fuck out of (my) place." Kilby replied "seriously?" and JANE DOE 20 said "yes."

168.   Kilby left JANE DOE 20's apartment visibly angry.

### *Subsequent Harassment*

169.   Kilby contacted JANE DOE 20 the following day via text message stating he was leaving back to Indiana. JANE DOE 20 replied "okay." She said he texted that he had been "waiting for that for five months" and that they did not even do what he wanted to do.

170.   When the two spoke over the phone, JANE DOE 20 told Kilby she had said "no" multiple times during the assault, at which point, Kilby would get confused asking her "what, what do you mean?"

171.   The conversation was continued through subsequent text messages where JANE DOE 20 told Kilby again that she had said "no" multiple times.

172.   Kilby contacted JANE DOE 20 two days after the assault had taken place saying he had done something "bad." She asked what he was talking about to which Kilby responded "no, just forget it."

173.   Kilby admitted to JANE DOE 20 he had filmed himself strangling her with the belt from behind and showed the video to his friend on the EMU football team. JANE DOE 20 expressed utter disbelief and disconnected the call.

174.   Kilby subsequently began to send JANE DOE 20 multiple text messages including the video of her being raped and strangled.

175.   Kilby sent a second video of the two before the assault happened where JANE DOE 20 can be heard saying "we are just friends, nothing more."

176.   On March 3,2017 Bourg went to the Washtenaw Health Center to get an STI/STD test following her rape, which came back negative.

### *Concealment and Concert of Actions*

177.   JANE DOE 20 reported her rape to Defendant Werner on March 9, 2017, through the Title IX investigative reporting system.

178.   On March 10, 2017 JANE DOE 20 met with Defendants Werner and EMUPD in her office at the Student Center. This meeting included a Title IX investigation of the assault.

179.   JANE DOE 20 reported her assault to Defendant EMUPD on March 10, 2017, after Defendant Werner had advised on the investigation.

180.   During the investigation JANE DOE 20 spoke with Detective Elliot from Defendant EMUPD. During the report she showed the Detective the video

Kilby had taken of the assault. After the video ended, Detective Elliot suggested to JANE DOE 20 it sounded as if she was "moaning" in the video.

181.   On March 13, 2017, JANE DOE 20 was given accommodations allowing her to miss class on March 16, 2017 and make up any missing assignments.

182.   Defendant Werner ultimately concluded that the evidence provided was inconclusive with respect to JANE DOE 20's allegations of sexual misconduct.

183.   Defendant Werner approved an investigation report made May 1, 2017, which stated "the evidence provided was inconclusive with respect to the allegations that [Kilby] engaged in sexual assault and that he showed a video of the Parties' sexual encounter to this party without the Complainant's consent."

184.   Defendant Werner determined the evidence provided by JANE DOE 20 did not support the claim that Kilby violated EMU's Title IX or Sexual Misconduct policy.

## JANE DOE 21

185.   JANE DOE 21 enrolled at EMU in the fall of 2015.

186.   JANE DOE 21 met Emily Scott through the dance program at EMU. Scott and JANE DOE 21 had performed choreography together throughout the program, had become acquaintances, and had regular interactions.

187.   JANE DOE 21 formally met Chris Rutenber through Emily Scott; she had informally met Rutenber on a handful of occasions.

188.   Scott and Rutenber were dating during the time of JANE DOE 21's rape.

189.   Previous to JANE DOE 21's rape, she and Scott had talked of how couples prey on bisexual women for having "threesomes." The two agreed it was wrong as most bisexual women are often pursued and pressured to fit the taboo expectation.

190.   After this conversation, JANE DOE 21 was on the popular dating application "Tinder." JANE DOE 21 would consistently have Scott and Rutenber pop-up as possible matches, which she thought was odd. JANE DOE 21 would swipe "not interested" on the couple only to have them pop up again subsequently.

191.   JANE DOE 21 felt as if Scott and Rutenber were looking to have a threesome and were not opposed to JANE DOE 21. JANE DOE 21 decided not to bring up the possible matches on Tinder with the couple, as they did the same.

192.   JANE DOE 21 remembered a past conversation where she was asked if she would ever "hook up" with Scott and Rutenber to which she replied "Absolutely not. I would never be interested in fucking Emily and Chris."

### *Night of the Assault*

193.   On October 19, 2019, JANE DOE 21 stood in front of her mirror, nervous to go out as she would be fifth wheeling a group of couples, including Scott and Rutenber.

194.   JANE DOE 21 felt "off" as the night proceeded, yet, chalked it up to social anxiety.

195.   JANE DOE 21 and the group started off the night at NECTO, a local club located in downtown Ann Arbor, MI.

196.   JANE DOE 21 was alone with Scott and Rutenber because the second couple was running late and decided to meet the trio at the second club, LIVE.

197.   The trio ordered drinks as the night began; JANE DOE 21 had one drink and roamed the club for an hour before moving to the next club. Unexpectedly, the club had the policy to meet a minimum purchase limit. JANE DOE 21 purchased a shot to meet the limit and get her card back. Scott and Rutenber ordered shots to meet the purchase limit as well.

198.   Rutenber then told Scott and JANE DOE 21 he could not take his shot because he was the driver. Rutenber and Scott then told JANE DOE 21 to drink it and "have fun" as they talked her into taking two more drinks before leaving the club.

199.   After leaving NECTO, the trio arrived at the second club LIVE, which was also located in downtown Ann Arbor. They met up with the second couple as JANE DOE 21 was now fifth wheeling.

200.   While at LIVE, JANE DOE 21 began to feel drunk after a couple of hours and a couple of drinks. During the next round of drinks, JANE DOE 21

decided to have water instead and announced to the group the alcohol was catching up with her.

201.   At one point during their time at LIVE, Scott and Rutenber bought the group a round of shots. JANE DOE 21 thought this was odd because the couple had been struggling financially but thought this was generous.

202.   JANE DOE 21 remembers sitting in the booth as the couple ordered the shots at the bar for the group. JANE DOE 21 wondered what had been taking them so long and why the couple was standing closely over the bar.

203.   After the bartender handed Scott and Rutenber the shots, the couple continued to stand over them for period of time. Eventually, they came back to the table. Instead of putting the shots down for everyone, the couple called out the names for each shot as they were handed out.

204.   Sometime after JANE DOE 21 received her drink from Scott and Rutenber she lost complete control of her body. JANE DOE 21 was unable to stand up and had trouble keeping her balance.

205.   The group began to create a tight circle around JANE DOE 21 as they danced at the club. The group would take turns holding up JANE DOE 21 as she continued to lose her balance.

206.   Later that evening JANE DOE 21 remembers sitting down again and beginning to kiss each member of the group after it was encouraged.

207.   JANE DOE 21 remembers being embarrassed and telling the group how drunk she must have been. Rutenber began to film JANE DOE 21 making out with members of the group on his cellphone. JANE DOE 21 told Rutenber "please, I'm so drunk, please don't get this on camera." Rutenber eventually did stop after JANE DOE 21 pleaded. JANE DOE 21 is unsure if Rutenber put these videos on any form of social media.

208.   JANE DOE 21 then went to the bathroom upstairs in the club. Scott followed JANE DOE 21 up to the bathroom gto get her alone.

209.   JANE DOE 21 was told by Scott that she and Rutenber wanted to have a threesome and they were attracted to and interested in her.

210.   JANE DOE 21 while alone with Scott was somewhat flattered and jokingly said "sure" thinking this would not actually take place. JANE DOE 21 thought this was not serious and figured she meant another time due to the fact she could not walk without having help, that they had been drunk, and would laugh in the morning about the conversation.

211.   Eventually, the group left the club; Scott and Rutenber drove JANE DOE 21. The couple had to help JANE DOE 21 walk and get into the car. JANE DOE 21 remembers asking if it was safe for Rutenber to be driving. Rutenber proceeded to tell JANE DOE 21 he only had one drink while at the second club and was completely sober.

212.   During the car ride home Scott and Rutenber asked JANE DOE 21 if she wanted to stay the night with the couple and "have some fun." The couple told JANE DOE 21 "your consent really matters to us are you sure?" Which JANE DOE 21 replied "yes."

213.   After parking the car JANE DOE 21 had to be hoisted over Scott and Rutenber's shoulders as she could not walk and be carried down the street.

214.   JANE DOE 21 was in and out of consciousness as the night continued.

215.   Once entering the apartment JANE DOE 21 was stripped by Scott and Rutenber as they complimented her body. JANE DOE 21 then told the couple it was not a good idea to have sex because she was intoxicated and tired, which the pair ignored.

216.   JANE DOE 21 told the couple "Isn't it weird that I'm so drunk and Chris is sober?" Rutenber replied "I had another drink right before we left the club, and it's starting to hit me. I'm drunk to now."

217.   Both Scott and Rutenber began to perform sexual acts on JANE DOE 21 as she was in and out of consciousness.

218.   At one point JANE DOE 21 began to perform oral sex on Rutenber but was unable to hold her head up as she continued to lose consciousness.

219.   Rutenber then began to vaginally penetrate JANE DOE 21 without asking as she laid there helpless. JANE DOE 21 while conscious remembers to think why did Rutenber not have a condom on.

220.   While Rutenber penetrated JANE DOE 21, she was incapacitated unable to move, speak, stay awake, or keep her eyes open during the rape.

221.   At one point JANE DOE 21 had a bodily reaction while being penetrated which Scott and Rutenber perceived as an orgasm. JANE DOE 21 woke up confused and startled as the couple high-fived each other.

222.   JANE DOE 21 then fell asleep at the feet of Scott's futon to the opening scene of her childhood comfort Disney movie "Emperor's New Groove" completely naked, cold, and ashamed.

223.   The following morning JANE DOE 21 woke up early to no alarm. She walked back to her dorm perplexed. JANE DOE 21 did not have any regular hangover symptoms after struggling to function the night before.

224.   JANE DOE 21 thought to herself "Should I take Plan-B? Should I get tested?" She arrived at her dormitory on campus, got into her room, and in bed, fully clothed. JANE DOE 21 slept for hours following the assault.

225.   JANE DOE 21 woke up and took a shower still stunned. Nothing made sense to her. She had a bad feeling but stifled it. JANE DOE 21 had drunk that much before and it was a reasonable amount of the course of several hours.

226.   JANE DOE 21 believes after much thought, Scott and Rutenber dissolved GHB, anxiety medication, sedative, or a date rape drug into her drink.

### *Subsequent Harassment*

227.   JANE DOE 21 had to encounter Scott regularly through dance program functions. Scott would continue to remind JANE DOE 21 her lipstick was lost in her apartment the evening of the assault.

228.   JANE DOE 21 would tell Scott, "Forget about the lipstick, I don't want it back." Scott would continue to insist and bring it up every time the two encountered each other, sometimes laughing a bit.

229.   Approximately two weeks after the assault, JANE DOE 21 was messaged via Facebook by Rutenber and Scott trying to get her to come and drink. JANE DOE 21 uncomfortably told the couple she had drank too much and was not interested. Scott and Rutenber told JANE DOE 21 "we will give you some time to recover."

230.   JANE DOE 21 felt disgusted by the wording the couple had used. It had seemed intentional and vaguely referred to JANE DOE 21's drinking and assault. Rutenber sent a second message four days later of a bottle of Jameson, implying a second invitation.

231.   In continued rehearsals, Scott decided she had a new vision for her dance choreography, which JANE DOE 21 was part of. JANE DOE 21 was to

remove layers of clothing while stumbling across the stage and repeating sexually suggestive movements. Scott also contemplated adding a male to the dance with JANE DOE 21 but stood in place until she could find the right participant.

### *Concealment and Concert of Actions*

232.   Six months after the assault JANE DOE 21 emailed Melody Werner that she wanted to report a Title IX incident and needed to meet with her. Werner told JANE DOE 21 she was unavailable during all the times she was not in class or at rehearsal. After going back and forth Werner could meet with JANE DOE 21 in over a week.

233.   Upon the anticipation of the meeting with Title IX, JANE DOE 21 missed her application deadline for the RA position the preceding year. JANE DOE 21 asked her supervisor if he could accommodate her need and extend the deadline.

234.   After reaching out to her supervisor and explaining her Title IX meeting, rape, and why she had missed the deadline multiple supervisors were brought into the situation. JANE DOE 21 had counted at one point ten people were involved when she had only disclosed her rape to three.

235.   The HRL department on campus told JANE DOE 21 supervisor verbally that she had to forward all communication she had with Title IX the week of the paperwork and submission deadline to three EMU staff members.

236.   JANE DOE 21 became uncomfortable, alarmed, and triggered at the situation and management of the departments involved. JANE DOE 21 questioned why they could not call Werner and Title IX themself to confirm contact had been made.

237.   JANE DOE 21 did not want to out the details or communication of her rape to further EMU staff members. She questioned why her consideration for keeping a job she currently held depended on telling the administration she was raped, it was a violation of Title IX.

238.   JANE DOE 21 eventually met with Werner where she was drilled on the details of her rape. JANE DOE 21 told Werner she was confused and suspicious about how she got so intoxicated but felt normal the following morning. JANE DOE 21 further explained she could not walk or speak at the time of her rape and had lost consciousness several times unable to recall everything that had happened.

239.   Werner in turn asked JANE DOE 21 "are you sure you were incapacitated, are you absolutely sure you were incapacitated?" JANE DOE 21 replied, "yes, I was passed out." Werner pressed on throughout the interview "are you sure you were incapacitated?"

240.   Werner asked the names of the two rapists and if they were current students at EMU. JANE DOE 21 told Werner, Rutenber was not a student at the University and was unsure if he was in the area or out of state. Werner told JANE

DOE 21 "then I won't put his name down. If he's not a student and not around anymore, reporting his name isn't important."

241.   Werner asked JANE DOE 21 if she wanted a trial or investigation but never explained what either entailed or if she could remain anonymous. JANE DOE 21 was scared of being victimized further, being bullied, intimidated by her rapists, or the risk of her report getting back to the individuals. Werner told JANE DOE 21 "you don't have to do it if you don't want to."

242.   Werner never explained what would happen if JANE DOE 21 pursued a trial, Werner never explained if it was an independent investigation or with the University and was never offered any protection to ease her safety concerns.

243.   JANE DOE 21 told Werner she was concerned that her employer at EMU required that she shared communication to prove she had been in contact with Title IX. Werner told JANE DOE 21 "well, I can see how they were looking at this from a business perspective and not a Title IX perspective." JANE DOE 21 concerned, asked if that was a Title IX violation. Werner responded "There is nothing I can do about that. That would be an accusation against the University itself."

244.   Werner told JANE DOE 21 the only resources she could offer would be for JANE DOE 21 to politely email her professors and ask for academic

accommodations if she felt they were needed. It was however up to the professors and their discretion to provide the accommodation.

245.   Werner also told JANE DOE 21 she could talk to HRL and have them apologize for the mistreatment but that was the most Werner could offer.

246.   Shortly after Werner's departure from the University JANE DOE 21 was struggling in a class overwhelmed from PTSD that had been elevating after her meeting with Werner.

247.   JANE DOE 21 had sought professional help but asked her professor to take examinations at home where she could associate with safety. The interim coordinator ordered the academic accommodations which were approved by the dean and were absolutely required by her professors.

248.   JANE DOE 21 was denied accommodations in the class she was struggling in. JANE DOE 21 stayed after class and explained to her professor she had been raped and needed academic support while healing.

249.   After emailing the interim Title IX coordinator her professor changed her grade to an 'A' due to the lack of accommodations. Her professor later cornered her in the University stairwell. Her professor brought up JANE DOE 21 case and insisted "he didn't do anything wrong." Title IX and the dean never erased out to them prior to her speaking in class.

250.   JANE DOE 21 felt overwhelmed, triggered, and uncomfortable about the situation.

## JANE DOE 22

251.   JANE DOE 22 enrolled at EMU in the Fall of 2016.

252.   JANE DOE 22 met Jason Ascencio (hereinafter "Ascencio"), an EMU student and member of Defendant ASP – CHAPTER, in the Fall of 2018 after matching on Tinder, a popular online dating app.

253.   JANE DOE 22 previously encountered Ascencio two times prior to her sexual assault. On the second of those occasions, JANE DOE 22 and Ascencio engaged in consensual sex.

### *Night of the Assault*

254.   On November 5, 2018, JANE DOE 22 was invited by Ascencio to the ASP fraternity house, where Ascencio lived.

255.   Upon her arrival to the house, JANE DOE 22 and Ascencio went to his bedroom.

256.   JANE DOE 22 was on the bed with Ascencio, watching television and talking.

257.   JANE DOE 22 and Ascencio engaged in consensual sex one time, and JANE DOE 22 fell asleep after. Ascencio stayed awake and watched television. At

the time, JANE DOE 22 had removed her pants and fell asleep in her shirt and underwear.

258.   A few hours later, early in the morning on November 6, 2018, JANE DOE 22 woke up and felt Ascencio behind her, touching her.

259.   JANE DOE 22 realized that her underwear had been removed, and Ascencio was vaginally penetrating her with his penis. Ascencio used his hand to hold JANE DOE 22's arm down.

260.   JANE DOE 22 laid there frozen for a few minutes, unable to move or talk.

261.   JANE DOE 22 told Ascencio that she was sleeping and did not remember consenting to sex.

262.   Ascencio responded by asking, "what do you mean?" Ascencio told JANE DOE 22 that she "wanted it" and continued to penetrate her.

263.   JANE DOE 22 told Ascencio again that she had been sleeping. JANE DOE 21 told Ascencio to stop, and he finally did.

264.   JANE DOE 22 was unable to move after. JANE DOE 22 was too afraid to try to get up from the bed.

265.   JANE DOE 22 cried silently as she laid there and eventually fell back asleep.

266.   A few hours later, early the next morning, JANE DOE 22 woke up to Ascencio getting ready for class. JANE DOE 22 put her pants back on and left the ASP house to return to her apartment.

### ***Subsequent Harassment***

267.   Ascencio attempted to contact JANE DOE 22 in the day or two after the sexual assault. JANE DOE 22 responded initially then stopped and blocked Ascencio on all social media platforms.

268.   In the days following her sexual assault, JANE DOE 22 noticed vaginal soreness and bruising on her arm where Ascencio gripped her during the sexual assault.

269.   JANE DOE 22 did not tell anybody about her sexual assault for several days because she was processing what happened. During this time, JANE DOE 22 withdrew from social activities and struggled to engage in work and classes. JANE DOE 22 feared running into Ascencio on and near campus.

270.   JANE DOE 22 eventually told her best friend and a few other close friends. JANE DOE 22's friends encouraged her to file a police report and to see a doctor.

271.   One of JANE DOE 22's friends was dating another member of Defendant ASP – Chapter. With permission, the Defendant ASP – Chapter member was told that Ascencio sexually assaulted JANE DOE 22.

272. The Defendant ASP – Chapter member contacted JANE DOE 22 to offer support and to ask permission to tell the president of ASP – Chapter. JANE DOE 22 gave the ASP – Chapter member permission to tell Defendant ASP – Chapter's president.

### *Mystic Circle*

273. Upon information and belief, Defendant ASP – Chapter's fraternity members subsequently held a meeting referred to as the "Mystic Circle" in which Ascencio was questioned on what took place between him and JANE DOE 22.

274. Upon information and belief, the "Mystic Circle" is considered a judgment-free zone where members of the fraternity are able to confide any concerns without fear of revelation, retribution and/or judgment.

275. JANE DOE 22 was not present during the "Mystic Circle." The ASP – Chapter member who contacted JANE DOE 22 before detailed what took place at the "Mystic Circle."

276. Upon information and belief, Defendant ASP – Chapter members asked Ascencio to explain what occurred between him and JANE DOE 22.

277. Upon information and belief, Ascencio told Defendant ASP – Chapter members that him and JANE DOE 22 had consensual sex multiple times. Defendant ASP – Chapter members held a "vote" thereafter and found that Ascencio had not

sexually assaulted JANE DOE 22 and would not face any consequences from the Chapter.

### *Reporting and Inaction*

278.   During the break for Thanksgiving in November 2018, JANE DOE 22 told family members that she was sexually assaulted. She was encouraged to report her assault and to obtain medical assistance.

279.   On November 27, 2018, JANE DOE 22 went to Planned Parenthood and reported her sexual assault. She was encouraged to make a police report and was given information on resources for sexual assault survivors.

280.   On November 28, 2018, JANE DOE 22 reported her sexual assault to the Ypsilanti Police Department. She was interviewed by a detective and gave a written statement.

281.   In the few days following JANE DOE 22's report, Ascencio went to YPD and gave a written statement. Ascencio lied about the night of JANE DOE 22's sexual assault and stated that several encounters after November 6, 2018 happened between him and JANE DOE 22, none of which occurred.

282.   JANE DOE 22 was never contacted by Ypsilanti Police Department after making her initial report.

### *Defendant Melody Werner's Inaction*

283.   On December 4, 2018, JANE DOE 22 emailed Defendant EMU Title IX Office to request a meeting to report her assault.

284.   On January 9, 2019, at the beginning of the Winter 2019 Semester, JANE DOE 22 met with Defendant Melody Werner and told her that Ascencio sexually assaulted her. A formal investigation did not begin at that time.

285.   JANE DOE 22 was struggling socially and stopped going to classes shortly after the winter semester began. JANE DOE 22 missed work and rarely left her apartment out of fear of seeing Ascencio on campus.

286.   JANE DOE 22 developed depression and extreme anxiety.

287.   JANE DOE 22 did not formally withdraw from classes and failed all classes that semester due to the effects of her sexual assault.

288.   After the January meeting with Defendant Melody Werner, Werner sent JANE DOE 22 one follow-up email. JANE DOE 22 did not respond, and Defendant Werner did not attempt to contact JANE DOE 22 to inquire about her well-being.

289.   Months later, JANE DOE 22 registered for the Fall 2019 semester. On September 11, 2019, JANE DOE 22 was in a campus building for a class when she saw Ascencio.

290.   JANE DOE 22 ran in the opposite direction until she was outside of the building and out of sight of Ascencio. JANE DOE 22 had a panic attack.

291.   JANE DOE 22 was able to calm herself enough to walk to the Title IX Office. There, she spoke to Defendant Melody Werner and expressed intent to go forward with a formal investigation process.

292.   JANE DOE 22 also asked Defendant Melody Werner for assistance with applying for class withdrawal and tuition reimbursement for the winter 2019 semester. Defendant Melody Werner told JANE DOE 22 that she would help her.

293.   Defendant Melody Werner began to assist JANE DOE 22 with semester withdrawal forms during September and October of 2019. Anika Awai-Williams took over the formal investigation process during that time.

294.   In October 2019, Defendant Melody Werner suddenly stopped communicating with JANE DOE 22. She did not finish assisting JANE DOE 22 with semester withdrawal or the formal investigation process. Anika Awai-Williams continued the investigation but did not assist with semester withdrawal efforts on JANE DOE 22's behalf.

295.   JANE DOE 22 never resolved her semester withdrawal issue. As of 2021, JANE DOE 22 never received tuition reimbursement from Defendant EMU. JANE DOE 22's transcripts also report failing grades on all four of her registered classes in Winter 2019.

296.   During the eight-month Title IX investigation, Anika Awai-Williams continuously tried to dissuade JANE DOE 21 from moving forward. Anika Awai-

Williams made several statements to JANE DOE 21 suggesting that the panel was unlikely to find Ascencio responsible and that the formal appeal process would be detrimental to JANE DOE 22 because she would have to face Ascencio.

297.   Toward the end of the formal investigation, JANE DOE 22 was passed off again to another investigator in the Title IX Office, Justin Landis. Justin Landis played a passive role in JANE DOE 22's investigation and communicated with JANE DOE 22 only a few times.

298.   At the end of the investigation, in the final report, Anika Awai-Williams suggested to the panel that JANE DOE 22 may have been lying about her sexual assault. Anika Awai-Williams also suggested in the final report that JANE DOE 22 may have filed a Title IX complaint in retaliation for Ypsilanti Police Department failing to pursue charges against Ascencio.

299.   To no one's surprise, the panel found Ascencio not responsible. JANE DOE 22 felt defeated by the entire Title IX process and ultimately elected not to appeal the panel's decision.

## JANE DOE 23

300.   JANE DOE 23 enrolled at EMU in the Fall of 2017.

301.   JANE DOE 23 met Noah Denniston (hereinafter "Denniston"), an EMU student and ROTC member, in the Fall of 2017.

302.   JANE DOE 23 and Denniston had classes together at EMU.

303.   JANE DOE 23 and Denniston became friends and would spend time together outside of classes.

304.   On one occasion, JANE DOE 23 and Denniston played a game with handcuffs during which Denniston non-sexually touched JANE DOE 23, making her feel uncomfortable.

### ***Night of the Assault***

305.   In October 2018, JANE DOE 23 and Denniston met up at Starbucks on campus and went back to JANE DOE 23's dormitory room after.

306.   While in the presence of JANE DOE 23 and her roommates, Denniston began to make racist jokes that made everyone feel uncomfortable. JANE DOE 23 asked Denniston to go for a walk to get him out of the room quickly. JANE DOE 23 intended to walk and talk with Denniston for a short time and then return to her dormitory afterward.

307.   While walking near campus, JANE DOE 23 and Denniston engaged in a conversation about consent. JANE DOE 23 expressed her belief that the only true expression of consent is an enthusiastic yes. Denniston believed that girls would "play hard to get" but that one can recognize consent from body language. Denniston commented that "some women want to be pursued."

308.   While continuing to walk, JANE DOE 23 expressed that she had to go to the bathroom and Denniston offered for her to come to his apartment since it was closer than her dormitory.

309.   JANE DOE 23 and Denniston went to Denniston's apartment and JANE DOE 23 used his bathroom. When JANE DOE 23 came out, Denniston told her that he wanted to show her something.

310.   Denniston pulled a rifle out from his closet and held it in such a way that placed JANE DOE 23 between Denniston and the gun, trapped in between his arms.

311.   Denniston removed the clip from the rifle, but Denniston did not empty the chamber.

312.   While Denniston was talking about the gun, JANE DOE 23 remembers "freezing" where she was and feeling nervous. At that point, JANE DOE 23 could tell that Denniston was sexually aroused through his clothing.

313.   JANE DOE 23 pulled away from Denniston and made her way toward the door when Denniston asked her to sit next to him on the couch so that he could use her vaping pen.

314.   JANE DOE 23 felt nervous, but she reluctantly sat down on the couch and watched Denniston's roommate play video games.

315.   JANE DOE 23 moved herself as far from Denniston as possible on the couch, sitting on the corner to avoid touching Denniston.

316.   Denniston pulled JANE DOE 23 toward him and began to rub her side. JANE DOE 23 said "no" to Denniston as she pulled away and pushed his hand off her.

317.   Denniston continued to touch JANE DOE 23, rubbing one thumb along her bra strap and one thumb along her pant line.

318.   JANE DOE 23 pulled away from Denniston more forcefully, but Denniston maintained his grip and rubbed JANE DOE 23's chest.

319.   JANE DOE 23 again pulled away from Denniston more forcefully and told Denniston that she needed to return to her dormitory for her planned video call with her fiancé. Denniston insisted on walking with JANE DOE 23 to the edge of campus.

320.   Before JANE DOE 23 and Denniston reached campus, Denniston picked JANE DOE 23 up and swung her around. Another man walking nearby stopped Denniston and asked JANE DOE 23 if she was alright, insisting that JANE DOE 23 be the one to answer. The man watched JANE DOE 23 to ensure she reached campus safely.

321.   Upon arriving at her dormitory, JANE DOE 23 told her roommate that Denniston assaulted her at his apartment.

322.    JANE DOE 23 and her roommate sent Denniston a message that said that she did not like or want the way he touched her and that she did not want Denniston to contact her.

323.    Denniston replied to JANE DOE 23, saying that he was "pretty sure [she] wanted it," but "my bad."

### *Failure of EMU's Women's Resources*

324.    The day after the assault, JANE DOE 23 felt violated, confused, and sick. JANE DOE 23 left her class early after finishing a test. She could not concentrate, as she reimagined Denniston's gun pressed to her chest and Denniston's hands touching her.

325.    JANE DOE 23 searched for a place to feel safe and went to the Women's Resource Center on campus. The woman working there seemed nice, but after disclosing her sexual assault, JANE DOE 23 was given a lot of conflicting information.

326.    While speaking with the woman, JANE DOE 23 was told that it was not her fault, but the woman also questioned JANE DOE 23's behavior toward Denniston, her clothing, and her personal life. The employee did not ask JANE DOE 23 about Denniston's behavior.

327.    JANE DOE 23 was asked if she flirted with Denniston and suggested that JANE DOE 23 may have sent confusing signals to Denniston. JANE DOE 23

was told that just because it was not her fault, that did not mean that Denniston was at fault either.

328.   JANE DOE 23 was told by the Women's Resource Center employee that there was not enough evidence to charge Denniston and that it would be best not to investigate her complaint. JANE DOE 23 left the center feeling confused, questioning if she was even sexually assaulted.

329.   JANE DOE 23's father filed a complaint against the Women's Resource Center for asking JANE DOE 23 inappropriate questions and suggesting that she was at fault for her sexual assault.

### _Title IX Failure and Mismanagement_

330.   Days later, Defendant Melody Werner contacted JANE DOE 23 after a concerned professor contacted Werner. After meeting with Defendant Werner and recounting her assault, Defendant Melody Werner made JANE DOE 23 feel even more alone in her experience.

331.   Defendant Melody Werner told JANE DOE 23 that her case was a "he said, she said" situation, that no legal action could be taken, and that Defendant Werner would follow through with an informal letter to Denniston.

332.   Defendant Melody Werner was "enthusiastic" to hear that JANE DOE 23 did not want to "punish" Denniston, she only wanted Denniston to leave her alone and understand that he violated her.

333.   Defendant Melody Werner told JANE DOE 23 that she could inform the ROTC of Denniston's off-campus weapon since Denniston was a member. JANE DOE 23 wanted to inform the ROTC about the weapon in case it was his military weapon, since Denniston's conduct with the gun would have violated ROTC regulations.

334.   JANE DOE 23 expressed her fear of Denniston confronting her if she went to the ROTC, but Defendant Werner assured JANE DOE 23 that she would contact Denniston before that.

335.   Defendant Werner contacted JANE DOE 23 the next day to inform JANE DOE 23 that she planned to wait to contact Denniston until the following week so that Denniston would not spend his weekend worrying. Defendant Werner told JANE DOE 23 that this delay would give JANE DOE 23 time to be sure that she wanted to take such actions against Denniston. Defendant Werner's message left JANE DOE 23 distressed, as she was hoping the matter would be dealt with quickly.

336.   JANE DOE 23 met with the ROTC that week. JANE DOE 23 disclosed how Denniston had used the gun, that he did not clear the chamber, and that Denniston had assaulted JANE DOE 23. The ROTC assured JANE DOE 23 that they would investigate Denniston's weapon and that he would be held accountable otherwise.

337.    Early the following week, Defendant Melody Werner contacted JANE DOE 23 to inform her that no further action on Defendant Werner's part would be necessary since JANE DOE 23 spoke to the ROTC.

338.    JANE DOE 23 believed that Defendant Werner put a no-contact order in place against Denniston; she later found out that no such order was issued. JANE DOE 23 also believed that Denniston's rifle had been confiscated; she later found out that it had not been.

### *Subsequent Contact and Harassment*

339.    In the months following the assault, JANE DOE 23 suffered from extreme depression, anxiety, and paranoia. She saw Denniston frequently since the two had classes in the same building. When JANE DOE 23 did not see him, she feared that she would. JANE DOE 23 began taking prescription anti-anxiety medication to cope with her feelings of fear and depression.

340.    During the following semester, JANE DOE 23 ran into Denniston. JANE DOE 23 was using crutches due to a knee injury and was accompanied on campus by two friends. While talking to her friends, Denniston aggressively approached JANE DOE 23. JANE DOE 23's friends stood in front of her and blocked Denniston's approach.

341.   JANE DOE's friend commented that Denniston seemed extremely angry and asked her if she was safe. Stricken by terror, JANE DOE 23 was unable to answer her friend.

342.   JANE DOE 23 encountered Denniston again on her way to a class on campus. When Denniston saw JANE DOE 23, he winked at her and laughed as he passed by. JANE DOE 23 was fear-stricken again, unable to respond.

343.   JANE DOE 23 did not report either of those encounters with Denniston because she did not think EMU officials would care or take action.

## JOHN DOE 24

344.   JOHN DOE 24 enrolled at EMU in the Fall of 2018.

345.   JOHN DOE 24 met Brianna Burns (hereinafter "Burns"), an EMU student, in the Fall of 2019.

346.   JOHN DOE 24 and Burns lived in the same dormitory, Wise Hall, at EMU.

347.   JOHN DOE 24 had a private dormitory room due to disabilities including depression, ADHD, and generalized anxiety disorder.

348.   During JOHN DOE 24's sophomore year, he and Burns became friends and would often play video games and do homework together in JOHN DOE 24's private dormitory room.

349.   As their friendship developed, Burns made romantic advances towards JOHN DOE 24, which he consistently turned down.

350.   On November 23, 2019, Burns confessed her love to JOHN DOE 24 while they sat in his car. JOHN DOE 24 responded by telling Burns that he only saw her as a friend and that he would end their friendship if she could not maintain a nonsexual friendship. Burns agreed to respect JOHN DOE 24's boundaries and maintain a nonsexual friendship.

### *Night of the Assault*

351.   On or about December 10, 2019, JOHN DOE 24 invited Burns to come to him dormitory to watch TV. The two watched TV for approximately an hour, and at around 11 p.m., JOHN DOE 24 ingested a dose of Ambien, his prescription sleep aid.

352.   JOHN DOE 24 told Burns that Ambien makes him "loopy" and "out of it" and made it known to Burns that once he takes his medication, she should let herself out as she had done in the past.

353.   After JOHN DOE 24 took his medication, he started to feel disoriented.

354.   Rather than leave, as instructed by JOHN DOE 24, Burns positioned herself closer to JOHN DOE 24, who was sitting in his desk chair.

355.   Burns then started to take off JOHN DOE 24's pants while offering to be "friends with benefits." As JOHN DOE 24 laid helpless from his medication's effects, Burns, still fully clothed, began to perform oral sex on him.

356.   Burns became frustrated that JOHN DOE 24 was unable to achieve an erection. She then began kissing JOHN DOE 24 and physically escorted him to his bed.

357.   JOHN DOE 24 was unable to stop Burns due to the dizzying effects of his medication.

358.   Burns removed her clothes, climbed into JOHN DOE 24's bed, and placed JOHN DOE 24 on his back in a "missionary position."

359.   Fully under the effects of his medication, JOHN DOE 24 had no control of his body and was unable to get an erection, despite Burns' several attempts at unsolicited and unwanted oral sex.

360.   Burns suddenly grabbed JOHN DOE 24's flaccid penis and forcefully attempted to insert it into her vagina.

361.   Despite several attempts, Burns was unable to stimulate a drugged JOHN DOE 24 to erection and eventually left him alone in his dorm room.

### *Subsequent Harassment and Stalking*

362.   The morning after the assault, Burns admitted to taking advantage of JOHN DOE 24 while he was under the effects of his medication. Burns told him that she felt no remorse.

363.   JOHN DOE 24 told Emily, a mutual friend of his and Burns, about the sexual assault. Emily told JOHN DOE 24 that Burns had already told her about the sexual assault.

364.   In the following weeks, JOHN DOE 24 was contacted by Burns multiple times per week, both in person and via text message.

365.   JOHN DOE 24 began to feel like Burns was stalking him. On several occasions, Burns would wait for JOHN DOE 24 in the common room of Wise Hall and confront him as he came up the stairs or elevator. On numerous occasions, Burns would place herself in his path to force an interaction.

366.   JOHN DOE 24 consistently told Burns to stay away from him.

367.   Burns began to threaten suicide through in various messages to JOHN DOE 24. This manipulating behavior led JOHN DOE 24 to advise Burns' friend of Burns' threat to harm herself.

368.   The continuous perceived stalking by Burns after the assault further perpetuated JOHN DOE 24's extreme anxiety.

369.   This continuous and constant stalking and torment by Burn's created an insufferable position for JOHN DOE 24. It was only until late February of 2020, where Burns was forced to leave the dormitory due to COVID-19, that JOHN DOE 24 found relief from Burns' stalking.

### *Continued Contact*

370.   After moving back into the dorms in the fall of 2020, JOHN DOE 24 realized Burns was in the same dormitory, Wise Hall.

371.   Due to the extensive harassment he faced the year prior, JOHN DOE 24 decided to report his assault to his resident advisor ("RA").

### *Concealment and Concert of Actions*

372.   JOHN DOE 24 reported his assault to his RA in the fall of 2020.

373.   Upon information and belief, an EMU RA is a mandated reporter of sexual assault.

374.   JOHN DOE 24's RA contacted EMUPD to come to JOHN DOE 24's dormitory and to speak with JOHN DOE 24 about his sexual assault and subsequent harassment.

375.   After speaking to JOHN DOE 24, EMUPD suggested he go to EMUPD's station to make a full statement.

376.   Upon information and belief, members of EMUPD are mandated reporters of sexual assault under EMU's sexual harassment policies.

377.   After JOHN DOE 24 reported to EMUPD, JOHN DOE 24 reported his sexual assault to the Title IX department via the university's online Sexual Misconduct Reporting Form.

378.   After nearly a month had passed, JOHN DOE 24 was informed that the police investigation into his sexual assault was closed due to lack of evidence.

379.   Title IX's initial approach to JOHN DOE 24 was to influence him not to investigate the sexual assault. In fact, instead of taking the sexual assault seriously, JOHN DOE 24 was told by Title IX officials that a formal investigation would prove fruitless and was persuaded into pursuing an informal resolution, which included seeking options for Burns to relocate to another residence hall.

380.   At the same meeting, JOHN DOE 24 explained to Title IX that Burns was continuously stalking and/or harassing him and that he wished to pursue a no-contact agreement as part of the informal resolution.

381.   JOHN DOE 24 continued to be a victim of Burns' stalking and again requested that Burns be relocated as he was uncomfortable living in the same residence hall as his assailant. However, after nearly six weeks from his initial meeting with Title IX, JOHN DOE 24 learned that Burns had both refused to enter into a no-contact order and had refused to relocate.

382.   JOHN DOE 24, based on his status as a male reporter of sexual misconduct, was denied reasonable accommodations and instead was asked to relocate himself.

383.   JOHN DOE 24 was effectively forced to move to a separate on-campus apartment across campus to avoid harassment and thwart another assault from his assailant, which resulted in a one-thousand-dollar ($1,000.00) price increase per semester.

## COUNT I
## SEXUAL HARASSMENT/ASSAULT IN VIOLATION OF 20 U.S.C. §1681 (TITLE IX)
### As to all EMU Defendants[5]

384.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

385.   Title IX states, in relevant part:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 USC §1681

386.   Plaintiffs are "persons" as defined in Title IX.

387.   The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, including fraternities and

---

[5] "EMU Defendants" include EMU Regents, EMUPD, Werner, Heighes and Karrick

sororities, and extends to sexual harassment and assault by employees, students and third parties.

388.   EMU is a recipient of federal funds and, as such, is subject to Title IX of the Education Amendments of 1972, as amended, 20 USC §1681, et seq., 34 CFR §106.31.

389.   Pursuant to Title IX, EMU is prohibited from discriminating on the basis of sex.

390.   EMU Defendants are required to investigate allegations of sexual assault, sexual abuse, and sexual harassment pursuant to Title IX.

391.   EMU Defendants are considered appropriate persons and/or mandated reporters for Title IX purposes, and based on EMU's definition of a "Responsible Employee" under its own Sexual Misconduct and Interpersonal Violence Policy (effective July 1, 2016), because they had/have the authority to:

      a.     Address and/or report sex discrimination;

      b.     Address and/or report sexual misconduct and/or sexual abuse;

      c.     Request investigations; and/or

      d.     Institute corrective measures.

392.   Plaintiffs were students at EMU when they were subjected to, based upon their sex, known sexually hostile environments, systemic sexual harassment,

sexual assaults, abuse, and/or otherwise prohibited conduct by EMU students and members of Defendant ASP – Chapter, constituting Title IX violations.

393.   Plaintiffs were participants in activities and programs of EMU at the time they were subjected to, based upon their sex, known sexually hostile environments, systemic sexual harassment, sexual assaults, abuse, and/or otherwise prohibited conduct by EMU students and members of Defendant ASP – Chapter, constituting Title IX violations. These "activities" and/or "programs" were part of the operations of and sanctioned by EMU.

394.   EMU Defendants had actual knowledge of the pervasive culture of sexual assaults being treated as acceptable that had been created and cultivated by EMU for many years.

395.   EMU Defendants had actual knowledge that this pervasive culture of sexual assaults at EMU would lead to more sexual assaults, such as those suffered by Plaintiffs.

396.   EMU Defendants had actual knowledge of sex discrimination, sexual harassment, sexual assaults, and other misconduct against Plaintiffs.

397.   The sex discrimination, sexual harassment, sexual assaults, and other misconduct suffered by Plaintiffs was severe, pervasive, and objectively offensive.

398.   One or more administrators or officials of Defendants EMU Regents, and/or EMUPD, including but not limited to Defendants Werner, Heighes, and

Karrick, (a) possessed authority to take corrective and preventative action on Plaintiffs' behalf, (b) had substantial control over the assailants, campus locations where the assaults occurred, and the  context in which the sex discrimination, sexual harassment, sexual assaults, rapes and other prohibited conduct occurred,  (c) were capable of determining a resolution for preventing the prohibited conduct committed by third-parties on EMU's campus and/or at EMU-sanctioned events, (d) had actual notice of said discrimination and failed to adequately respond, and (e) failed to provide security in violation of Title IX and EMU's own policies designed, drafted, and enacted by EMU Defendants.   EMU Defendants' failures were clearly unreasonable in light of surrounding circumstances and amounted to deliberate indifference toward the repeated sex discrimination, sexual harassment, sexual assaults, rapes and other prohibited conduct suffered by Plaintiffs.

399.   Pursuant to Title IX, EMU Defendants were required to investigate reported, known, and/or repeated sex discrimination, sexual harassment, sexual assaults, and/or other prohibited conduct, including but not limited to prohibited conduct by EMU students and members of Defendant ASP – Chapter.

400.   EMU Defendants had the proper Title IX policies to investigate known repeated sex discrimination, sexual harassment, sexual assaults and other misconduct committed within EMU's Greek Life.

401.   Defendant Werner gave a PowerPoint presentation to incoming students during orientation explaining EMU's Title IX policies and procedures.  By Defendant Werner's own admissions via her presentation:

a.   "[Title IX] requires schools to have a Title IX coordinator (Defendant Werner) **whose job is to respond effectively to *any* complaints of sexual discrimination**." (Emphasis added.)

b.   "If something were to happen to you, **or if you hear about something happening to one of your friends,** simply contact [Defendant Werner]." (Emphasis added.)

c.   "When should you talk to [Defendant Werner]?  If something has happened to you, **if something has happened to a friend**, or if you have a concern or a question." (Emphasis added.)

d.   "Also please be aware there is **no time limit**." (Emphasis added.)

e.   "It is **very common** for individuals who have experienced some type of sexual violence **to hold it in and not tell anybody for quite a while**.  It could be a week, it could be a month, **it might be three years later** before they're ready to come and talk and get the help that they might need. And **that is OK**.  **There is no time limit**." (Emphasis added.)

402.   EMU Defendants failed to adhere to said policies. This failure included, but was not limited to, improper customs, policies and/or procedures for the identification, reporting, investigation and prevention of unlawful discrimination, turning away victims of sexual assault, turning away advocates reporting on behalf of victims of sexual assault, and failing to properly investigate any and all claims of sexual assault.   Said failures were clearly unreasonable in light of surrounding

circumstances amounted to deliberate indifference toward repeated sex discrimination, sexual harassment, and other misconduct.

403.   When presented with a complaint of sexual assault, Defendant Werner would act as the final decision-maker as to which complaints were worthy of a Title IX investigation.

404.   Defendant Werner has stated the following to one or more Plaintiffs:

      a.    Only the victim can report the assault;

      b.    There is no point in reporting it;

      c.    That based on Plaintiffs' appearance and/or clothing, they were promiscuous;

      d.    The process of reporting is arduous;

      e.    Their claims lacked merit;

      f.    Members of Greek Life would be believed over Plaintiffs; and,

      g.    YPD will not believe Plaintiffs and will not want to investigate their claims.

405.   EMU Defendants possessed actual knowledge of sex discrimination, sexual harassment, sexual assaults and other prohibited misconduct occurring on campus via reports submitted by victims, reports anonymously submitted on behalf of victims, and their knowledge of general Greek Life culture at EMU which is known to include alcohol, minors consuming alcohol, illicit drugs, parties, and sex.

406.   A glimpse into the Greek Life culture at EMU is captured by Deputy Chief of Police Karrick's attempt to explain Title IX to Detective Coppock with the Ypsilanti PD, further establishing EMU Defendants actual knowledge. (Detective Coppock is the Officer in Charge of the criminal investigation against the defendants). "…If you have a campus that has a lot of rapes or guys that are catcalling girls or that type of culture, 'No' means 'yes' and 'yes' means 'anal,' then Title IX comes into play to say this is not a safe school for girls to be attending because they cannot get an equal opportunity to get an education with this type of stuff going on." (Hereinafter "Karrick's Title IX Description")

407.   When attempting to report, Plaintiffs, young and impressionable, were often dissuaded by Defendants to report because of the aforementioned representations.

408.   In some instances, Plaintiffs, and those seeking assistance on behalf of Plaintiffs anonymously, report the sexual assaults to EMU's Greek system and local chapters, trusting that members of the same would follow their own bylaws and regulations.  In response, Plaintiffs were ostracized by certain Defendants, as well as the entire Greek community, believing they had lied.

409.   EMU Defendants' conduct, coupled with their failures to investigate, prevent, and protect from known and repeated systemic sex discrimination, sexual harassment, sexual assaults, and other misconduct to countless female students,

including Plaintiffs, were clearly unreasonable in light of surrounding circumstances and demonstrated deliberate indifference.  Moreover, Defendants' conduct deviated significantly from the requirements and obligations contained in both federal laws, as well as EMU's policies and procedures.

410.  EMU Defendants, with actual knowledge of repeated Title IX complaints stemming from prohibited and pervasive conduct, acted clearly unreasonably in light of surrounding circumstances and with deliberate indifference resulting in Plaintiffs being "excluded from participation in" and/or "denied the benefits of" Defendant EMU, and its Title IX protections.

411.  Defendant ASP – Chapter demonstrated policies and practices of covering up sexual misconduct by its members: (a) failing to report sexual misconduct committed by its members to law enforcement or relevant EMU administrators, including but not limited to EMU Defendants (in violation of pertinent EMU Greek Life bylaws); (b) engaging in ad-hoc, internal disciplinary procedures that failed to properly discipline members that engaged in sexual misconduct; (c) engaging in unequal investigatory procedures that improperly favored male Greek community members accused of engaging in sexual misconduct over their female student victims; (d) discrediting student victims of sexual misconduct committed by its members; (e) tolerating and tacitly approving systemic

sexual violence committed by fraternity members; and (f) creating an atmosphere whereby the rules applicable to all students did not apply to fraternity members.

412. EMU Defendants further acted clearly unreasonable in light of surrounding circumstances and with deliberate indifference to known acts of sexual assault, abuse, and molestation on its premises by:

     a.    Failing to investigate and address other victim's allegations as required by Title IX;

     b.    Failing to adequately investigate and address the complaints regarding EMU's Greek Life members' conduct; and

     c.    Failing to institute corrective measures to prevent EMU students from violating and sexually abusing other students and individuals, including Plaintiffs.

413. Defendants' responses were clearly unreasonable in light of the known circumstances, as students, as well as members of EMU's Greek system, continued to sexually assault EMU students until 2020 when YPD began its investigation.

414. EMU Defendants' failure to promptly and appropriately investigate, respond to, and remedy the sexual assaults after receiving notice, subjected Plaintiffs to further harassment and a sexually hostile environment, effectively denying their access to educational benefits and opportunities at EMU, including but not limited to, Title IX protections.

## COUNT II
## SEX DISCRIMINATION/SEXUALLY HOSTILE EDUCATIONAL ENVIRONMENT IN VIOLATION OF 20 U.S.C. §1681
## (TITLE IX)
### *As to all EMU Defendants*

415.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

416.   Title IX states, in relevant part:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 USC §1681.

417.   Plaintiffs are "persons" as defined in Title IX.

418.   The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, including fraternities and sororities, and extends to sexual harassment and assault by employees, students and third parties.

419.   EMU is a recipient of federal funds and, as such, is subject to Title IX of the Education Amendments of 1972, as amended, 20 USC §1681, et seq., 34 CFR §106.31.

420.   Pursuant to Title IX, EMU is prohibited from creating and/or maintaining a sexually hostile educational environment.

421.   EMU Defendants, through their actions and inactions, fostered and condoned a sexually hostile educational environment that victimized and damaged Plaintiffs.

422.   EMU officials at the highest levels, including EMU Defendants, knew or should have known of the sexually hostile environment within EMU and its Greek system, and did nothing when action was required by law.

423.   Defendant EMU Regents, individually and collectively, are responsible for setting and approving public policy at EMU, while the President of EMU is responsible for administering those policies. At all relevant times, EMU's policies, including complaint procedures, training and reporting, and response procedures were in violation of Title IX.

424.   EMU's failure to act and failure to provide federally mandated procedures and protections created a sexually hostile educational environment for Plaintiffs.

425.   The harassment and hostile environment which EMU Defendants fostered and condoned operated to deny and/or limit Plaintiffs' abilities to participate in or benefit from EMU's educational programs.

426.   Plaintiffs were students at EMU when they were subjected to, based upon their sex, known sexually hostile environments, systemic sexual harassment,

sexual assaults, abuse, and/or otherwise prohibited conduct by members of EMU's fraternities and sororities, constituting Title IX violations.

427.   EMU Defendants had actual knowledge of sex discrimination, sexual harassment, sexual assaults and other prohibited misconduct occurring on campus via reports submitted by victims, reports anonymously submitted on behalf of victims, and general knowledge of the hostile culture at EMU which is known to include alcohol, minors consuming alcohol, illicit drugs, parties, and sex.

428.   Defendant Karrick's Title IX Description to Det. Coppock not only provides actual knowledge of the repeated sexual assaults, discrimination and other misconduct, but depicts EMU's dangerous culture, acquiesced to by EMU Defendants.

429.    At the very most, EMU's officials, including but not limited to, EMU Defendants responded to reports of sexual harassment with referrals to inadequate resolution procedures and suggestions that Plaintiffs were powerless against their assailants.

430.   EMU Defendants left Plaintiffs to their own skills to avoid further victimization, often at the expense of giving up educational classes, programs and experiences.

431.   Despite these increased burdens on Plaintiffs, EMU Defendants held Plaintiffs to a higher standard than their male peers. Students, including Plaintiffs,

were treated different than their male peers with respect to protection from reported

assailants further increasing the hostile environment.

## COUNT III
## RETALIATION IN VIOLATION 20 U.S.C. §1681 (TITLE IX)
### As to all EMU Defendants

432.   Plaintiffs reallege and incorporate by reference the allegations

contained in the previous and subsequent paragraphs.

433.   Title IX states, in relevant part:

> "No person in the United States shall, on the basis of sex,
> be excluded from participation in, be denied the benefits
> of, or be subjected to discrimination under any education
> program or activity receiving Federal financial
> assistance."  20 U.S.C. § 1681.

434.   Plaintiffs are "persons" under the Title IX statutory language.

435.   Defendant Regents is a recipient of federal funds and, as such, is subject

to Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681,

et seq., 34 CFR § 106.31.

436.   EMU Defendants are required under Title IX to investigate allegations

of sexual assault, sexual abuse, and sexual harassment.

437.   EMU Defendants, together with Defendant ASP – Chapter, are

'appropriate persons' as it pertains to reporting Title IX complaints.

438.   Plaintiffs engaged and/or attempted to engage in protected activity under Title IX by reporting Title IX discrimination to "Responsible Employees" and/or mandated reporters at EMU.

439.   Plaintiffs' protected activity was actually known to Defendants, which failed to respond and/or concealed Plaintiffs' repeated Title IX complaints.

440. EMU Defendants took adverse action against Plaintiffs when attempting to report sexual assault by denying them proper avenues to report their assaults; failing to provide safety from known assailants; ignoring reports of sexual assault by advocates of victims; and failing to properly investigate any and all sexual assault claims, whether reported to "Responsible Employees" through Title IX, EMU fraternities, EMU sororities, or on social media accounts of EMU students.

441.   As set forth above, there is a direct causal connection between Plaintiffs' protected activity and Defendants' adverse actions against them.

442.   These adverse actions against Plaintiffs were calculated to and did cause irreparable harm, injury, and damages.

## COUNT IV
## Violation of Civil Rights Under 42 U.S.C. § 1983 – State Created Danger
### As to Defendants Werner, Heighes and Karrick

443.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

444.   Plaintiffs enjoyed a substantive due process right guaranteed by the Fourteenth Amendment to avoid the risk of harm or danger created or increased by an affirmative act of the State.

445.   This right is violated when the State:

    a.   Engages in an affirmative act which either created or increased the risk that a plaintiff would be exposed to an act of violence by a third party;

    b.   Created or enhanced a special danger to the plaintiff wherein the State's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and

    c.   The State knew or should have known that its actions specifically endangered the plaintiff.

446.   The Defendants Werner, Heighes and Karrick's (hereinafter "EMU Individual Defendants") acts consisted of, but were not limited to, 1) permitting and condoning out of control fraternity parties where under-aged individuals were encouraged to consume alcohol such that they could not consent to sexual activity or advances allowing fraternity members to have sexual access to EMU students and guests, 2) lying about or concealing their knowledge that fraternities and their members were permitted to carry out their unlawful and abhorrent behavior, and 3) lying about or concealing their knowledge of sexual misconduct occurring on EMU's campus without proper investigation.

447.   EMU Individual Defendants' affirmative acts created or increased the risk that Plaintiffs would be exposed to an act of sexual violence which imposes a duty to protect from the same.

448.   EMU Individual Defendants' conduct created a special danger to Plaintiffs with whom Defendants had a special relationship as described above. The actions of Defendants specifically put this discrete group at increased risk in that the individual EMU Defendants knew that EMU's culture, particularly fraternity members, were causing underaged students to become intoxicated and then sexually assaulting them.

449.   EMU Individual Defendants knew or should have known that their affirmative acts specifically endangered Plaintiffs.

450.   EMU Individual Defendants acted in ways that permitted, condoned, and promoted sexually hostile behavior.

451.   EMU Individual Defendants' actions included:

a.   Failing to supervise, train and educate fraternities and their members about alcohol, service of alcohol to minors, sexually assaulting intoxicated females so that, in the absence of this supervision, training, and education the unlawful activities of the Defendant fraternities and their members could be carried out;

b.   Actively concealing the fraternity members' abhorrent behavior;

c.   Outright lying to students, parents, investigators, and law enforcement when confronted with the allegations against

various fraternity members prevented the detection of the repeated and subsequent sexual misconduct and served to cover up Defendants' liability for the damage they caused; and

d.      Promoting EMU as a safe campus for all students, despite having actual knowledge of sexual misconduct occurring on EMU's campus without proper investigation.

452.    Often times, after Plaintiffs would report their sexual assaults, Defendants would terminate any investigation before it could even begin, blaming a lack of response from Plaintiffs, even though Defendants had actual knowledge of both the sexual assaults and the fact that they did not need the victim to investigate the claims.

453.    EMU Individual Defendants' acts of permitting, condoning, and promoting EMU and its Greek life as a safe environment placed Plaintiffs specifically at risk to unspeakable invasions of their bodily integrity which were so egregious and outrageous that it shocks the conscience.

## COUNT V
## VIOLATION OF CIVIL RIGHTS – EQUAL PROTECTION PURSUANT TO 42 U.S.C. § 1983
### *As to all EMU Defendants*

454.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

455. Plaintiffs have a right to fair and equal treatment both as males and females, as members of a protected class, under the laws as guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

456. Plaintiffs further have a clearly established right to be free from sexual assault and/or sexual misconduct, as a student at EMU, a member of a protected class, under the laws as guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

457. The Sixth Circuit has held that sexual assault qualifies as being severe, pervasive, and objectively offensive sexual harassment.

458. EMU Individual Defendants violated this right when they intentionally treated Plaintiffs less favorably than other similarly situated persons regarding reports of sexual harassment, sexual assaults and other prohibited conduct occurring within EMU's Greek system, without a rational basis for such treatment.

459. At all relevant times to the instant action, Defendants Regents and EMUPD were responsible for training, screening, and supervising EMU Individual Defendants in response to Title IX complaints.

460. EMU Individual Defendants were supervisory personnel engaged within the scope and course of their supervisory duties.

461.   When presented with a complaint of sexual assault, Defendant Werner would act as the final decision-maker as to which complaints were worthy of a Title IX investigation.

462.   Defendant Werner has stated the following to one or more Plaintiffs:

      a.   Only the victim can report the assault;

      b.   There is no point in reporting it;

      c.   That based on Plaintiffs' appearance and/or clothing, they were promiscuous;

      d.   The process of reporting is arduous;

      e.   Their claims lacked merit;

      f.   Greek Life would be believed over Plaintiffs; and,

      g.   YPD will not believe Plaintiffs and will not want to investigate their claims.

463.   When attempting to report, Plaintiffs, young and impressionable, were often dissuaded by Defendants to report because of the aforementioned representations.

464.   In some instances, Plaintiffs, and those seeking assistance on behalf of Plaintiffs anonymously, reported the sexual assaults to EMU's Greek system and local chapters, trusting that members of the same would follow their own bylaws and regulations.  In response, Plaintiffs were ostracized by certain Defendants, as well as the entire Greek community, believing they had lied.

465.   Often times, after Plaintiffs would report their sexual assaults, Defendants would terminate any investigation before it could even begin, blaming a lack of response from Plaintiffs, even though Defendants had actual knowledge of both the sexual assaults and the fact that they did not need the victim to investigate the claims.

466.   EMU Individual Defendants intentionally and deliberately promulgated and/or carried out the aforementioned acts, orders, practices, customs, and directives, with wanton and reckless disregard for Plaintiffs' civil and constitutional rights.  Such conduct constitutes deliberate indifference and/or disparate treatment of Plaintiffs.

## COUNT VI
## VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 U.S.C. § 1983 – RIGHT TO BODILY INTEGRITY
### *As to Defendants Werner, Heighes and Karrick*

467.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

468.   Plaintiffs enjoy the constitutionally protected Due Process right guaranteed by the Fourteenth Amendment to be free from the invasion of bodily integrity through sexual assault, abuse, or molestation.

469.   At all times relevant hereto, EMU Individual Defendants were acting under color of law.

470.  The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in the EMU Individual Defendants' positions should have known.

471.  At all times relevant hereto, EMU Individual Defendants had the ultimate responsibility and authority to train and supervise their employees, subordinates, agents, and/or representatives in the appropriate manner of detecting, reporting, and preventing sexual abuse, assault, and molestation and as a matter of acts, custom, policy, and/or practice, failed to do so with deliberate indifference.

472.  As a matter of custom, policy, and/or practice, EMU Individual Defendants had the ultimate responsibility and authority to investigate complaints against their employees, subordinates, and representatives from all individuals including, but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

473.  At all relevant times hereto, EMU Individual Defendants had a duty to report and/or furnish results of their investigation into complaints of sexual harassment, sexual assault and other prohibited conduct.

474.  At all times relevant hereto, EMU Individual Defendants had a duty to prevent sexual assault, abuse, and molestation on their campus and premises, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title IX.

475.   EMU's internal policies provided that all University employees were expected to promptly report sexual misconduct or relationship violence that they observed or learned about and that involved a member of the University community (faculty, staff, or student) or occurred at a university event or on university property.

476.   EMU's above-mentioned internal policies were violated when the EMU Individual Defendants took no actions to address the complaints regarding sexual assaults at the hands of fraternity members.

477.   Often times, after Plaintiffs would report their sexual assaults, Defendants would terminate any investigation before it could even begin, blaming a lack of response from Plaintiffs, even though Defendants had actual knowledge of both the sexual assaults and the fact that they did not need the victim to investigate the claims.   Defendants would follow-up their denial/termination of investigation with an email purportedly to conceal their inaction.

478.   EMU Individual Defendants' failure to address these complaints led to an unknown number of individuals, including Plaintiffs, being victimized, sexually assaulted, abused, and molested by members of multiple fraternities.

479.   EMU Individual Defendants' aforementioned failures were repetitious and over time became a deeply embedded acquiesced policy to provide disparate treatment to victims of sexual harassment, sexual assaults and other prohibited conduct.

480.   EMU Individual Defendants acted with deliberate indifference and these failures and the harm they caused shock the conscience.

481.   The EMU Individual Defendants, who had or should have had knowledge of sexual misconduct, were the moving forces or causes of repeated constitutional injuries to Plaintiffs and others based on their failures to report, train, supervise, investigate, or otherwise act in response to complaints of alcohol-fueled sexual misconduct by fraternities and their members.

482.   Ultimately, the EMU Individual Defendants failed to adequately and properly investigate complaints of abuse including, but not limited to, failing to:

  a.   Perform a thorough investigation into sexual misconduct by fraternities and their members dating back to at least 2014;

  b.   Thoroughly review and investigate all policies, practices, procedures, and training materials related to the circumstances surrounding the conduct of fraternities and their members;

  c.   Recognize sexual assault when reported as early as 2014 and permitting University officials to deem a sexual assault as "medically appropriate" and "not of a sexual nature";

  d.   Ensure all institutional guidelines issued following the 2014 reported rape, described above, were satisfied; and,

  e.   Properly report results of investigations and take remedial action.

483.   By failing to prevent the above-mentioned sexual assaults and abuse, and by failing to appropriately respond to reports of alcohol-fueled sexual assaults

and abuse, in a manner that was so clearly unreasonable it amounted to deliberate indifference, the EMU Individual Defendants are liable to Plaintiffs pursuant to 42 U.S.C. §1983.

484.   EMU Individual Defendants' conduct and failures to act deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

485.   EMU Individual Defendants tolerated, authorized, and/or permitted a custom, policy, practice, or procedure of insufficient supervision and failed to adequately screen, counsel, monitor, or discipline the fraternities and the fraternity members, with the result that the fraternity and its members could violate the rights of persons such as Plaintiffs with impunity.

**COUNT VII**
**SEX DISCRIMINATION –**
**IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**
*As to All Defendants*

486.   Plaintiffs hereby incorporate by reference the paragraphs above and below as though fully stated herein.

487.   EMU is a place of public accommodation, a public service, and an educational institution as defined in Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 et seq. (ELCRA).

488.   All Defendants are "person(s)" as defined in ELCRA, and EMU Individual Defendants were agents of Defendant Regents and EMU.

489.    ELCRA prohibits:

      a.    Discriminating against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of sex;

      b.    Following a policy of denial of educational opportunities because of sex. MCL 37.2402.

490.    Defendants' acts and omissions constitute sex discrimination and violate Plaintiffs' rights under ELCRA by subjecting Plaintiffs to unwelcome sexual advances, assault and other conduct, both verbal and physical, of a sexual nature, all the while having actual knowledge of the same.

491.    Defendants were aware, or should have been aware through reports, discussions, and accepted EMU culture that a sexually hostile environment existed on EMU's campus.

492.    When presented with a complaint of sexual assault, Defendant Werner would act as the final decision-maker as to which complaints were worthy of a Title IX investigation.

493.    Defendant Werner has stated the following to one or more Plaintiffs:

      a.    Only the victim can report the assault;

      b.    There is no point in reporting it;

      c.    That based on Plaintiffs' appearance and/or clothing, they were promiscuous;

      d.    The process of reporting is arduous;

e.    Their claims lacked merit;

f.    Greek Life would be believed over Plaintiffs; and,

g.    YPD will not believe Plaintiffs and will not want to investigate their claims.

494.    Despite notice of the sexually hostile environment, Defendants failed to take prompt and adequate remedial action to end the ongoing sexual assaults and harassment of the Plaintiffs and other female students.

495.    Often times, after Plaintiffs would report their sexual assaults, Defendants would terminate any investigation before it could even begin, blaming a lack of response from Plaintiffs, even though Defendants had actual knowledge of both the sexual assaults and the fact that they did not need the victim to investigate the claims.

496.    When attempting to report, Plaintiffs, young and impressionable, were often dissuaded by Defendants to report because of the aforementioned representations.

497.    In some instances, Plaintiffs, and those seeking assistance on behalf of Plaintiffs anonymously, reported the sexual assaults to EMU's Greek system and local chapters, trusting that members of the same would follow their own bylaws and regulations.  In response, Plaintiffs were ostracized by certain Defendants, as well as the entire Greek community, believing they had lied.

498.   Defendants violated ELCRA and deprived Plaintiffs of their civil rights by, among other things, denying adequate protection from sexual assaults, failing to investigate and take remedial action, subjecting Plaintiffs, because of their sex, to conduct of a physical and sexual nature that had the purpose or effect of denying Plaintiffs the full benefit of the educational programs of EMU and full and equal access to the use and privileges of public accommodations, public service, and educational opportunity.

<div align="center">

**COUNT VIII**
**AIDING AND ABETTING IN VIOLATION OF THE ELCRA**
*As to All Defendants*

</div>

499.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

500.   EMU is a place of public accommodation, a public service, and an educational institution as defined in Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 et seq. (ELCRA).

501.   All Defendants are "person(s)" as defined in ELCRA, and EMU Individual Defendants were agents of Defendant Regents and EMU.

502.   ELCRA prohibits:

   a.   Discriminating against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of sex;

   b.   Following a policy of denial of educational opportunties because of sex. MCL 37.2402.

503.   Defendants violated ELCRA and deprived Plaintiffs of their civil rights by, among other things, denying adequate protection from sexual assaults, failing to investigate and take remedial action, subjecting Plaintiffs, because of their sex, to conduct of a physical and sexual nature that had the purpose or effect of denying Plaintiffs the full benefit of the educational programs of EMU and full and equal access to the use and privileges of public accommodations, public service, and educational opportunity.

504.   Through the exercise of reasonable care, Defendants could have limited the accessibility of sexual predators to vulnerable EMU students.

505.   By creating and condoning an environment in which sexually predatory individuals were allowed access to vulnerable EMU students, Defendants aided and abetted the creation of a sexually hostile environment in violation of MCL 37.2701(b).

506.   Defendants' actions have deprived Plaintiffs of the full and equal enjoyment of the educational programs of EMU and full and equal access to the use and privileges of public accommodations, public service, and educational opportunity.

**COUNT IX**
**GROSS NEGLIGENCE**
***As to Defendants ASP – Chapter and National***

507.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

508.   ASP – Chapter and ASP – National, ("ASP Defendants") owed Plaintiffs a duty to use due care to ensure their Fraternity members abstained from, among other things, illegal substance use, sexual assault, abuse, and molestation students and guests alike when interacting with their members, representatives, and/or agents.

509.   As agents and/or representatives of ASP Defendants, their members owed Plaintiffs a duty of due care as guests of ASP – Chapter. These duties include but are not limited to:

    a.    Reduce exposure to risk and liability of the Chapter and its members;

    b.    Complete an incident report and submit it to Headquarters for all incidents;

    c.    Educate members on alcohol policies;

    d.    Respect the dignity of all persons, and therefore, not physically, psychologically, or sexually abusing any human being;

    e.    Do not abuse, nor support the abuse of, alcohol or controlled substances;

    f.    Do not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional.   This includes any actions, activities, or events,

whether on chapter premises or an off-site location which are demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together;

g.    Familiarize and comply with Health and Safety Policies that forbid any form of hazing or assault;

h.    Prohibit alcohol and/or illegal substances, which is punishable by fine and/or expulsion; and

i.    Maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

510.  ASP Defendants' failure to adequately supervise its members - especially after they knew or should have known of complaints regarding their members' nonconsensual sexual assaults occurring on their premises - was so reckless as to demonstrate a substantial lack of concern for whether Plaintiffs would be injured.

511.  ASP Defendants' conduct demonstrated a willful disregard for precautions to ensure Plaintiffs' safety and bodily integrity.

512.  ASP Defendants' conduct described above demonstrated a willful disregard for the substantial risk of injuries to Plaintiffs.

513.  ASP Defendants' breached duties owed to Plaintiffs and were grossly negligent when they conducted themselves by the actions described above, said acts having been committed with reckless disregard for Plaintiffs' health, safety,

constitutional and/or statutory rights, and with a substantial lack of concern as to whether Plaintiffs would be injured.

<div align="center">

**COUNT X**
**NEGLIGENCE**
*As to Defendants ASP – Chapter and National*

</div>

514.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

515.   ASP Defendants owed Plaintiffs a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation while students and guests alike interacted with their members, representatives and/or agents.

516.   As agents and/or representatives of ASP Defendants, members owed Plaintiffs a duty of due care. These include but are not limited to:

  a.   Reduce exposure to risk and liability of the Chapter and its members;

  b.   Complete an incident report and submit it to Headquarters for all incidents;

  c.   Educate members on alcohol policies;

  d.   Respect the dignity of all persons, and therefore, do not physically, psychologically, or sexually abuse any human being;

  e.   Do not abuse, nor support the abuse of, alcohol or controlled substances;

  f.   Do not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional.   This includes any actions, activities, or events, whether on chapter premises or an off-site location which are

demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together;

g.    Familiarize and comply with Health and Safety Policies that forbid any form of hazing or assault;

h.    Prohibit alcohol and/or illegal substances, which is punishable by fine and/or expulsion; and,

i.    Maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

517. ASP Defendants' failure to adequately supervise its members, especially after ASP Defendants knew or should have known of complaints regarding their members' nonconsensual sexual assaults and sexual penetrations occurring on their premises was so reckless as to demonstrate a substantial lack of concern for whether Plaintiffs would be injured.

518. ASP Defendants had notice through its own members, agents, and/or representatives as early as 2014, of complaints of a sexual nature related to their members' predatory and criminal sexual misconduct of students and guests.

519. ASP Defendants knew or should have known of the foreseeability of its members' sexual abuse of students and guests.

520. ASP Defendants' failure to properly investigate, address, and/or remedy complaints regarding sexual misconduct was a breach of their duty to use ordinary care.

## COUNT XI
## NEGLIGENT SUPERVISION
### *As to Defendants ASP – Chapter and National*

521.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

522.   ASP Defendants had a duty to provide reasonable supervision of their fraternity members, agents and/or representatives during membership, agency or representation with ASP Defendants and while they interacted with guests of ASP Defendants including Plaintiffs.

523.   The National's maintained control over the local chapters.  Indeed, each National maintained rule which were presented to the Local Chapters and the Local Chapters were required to follow those rules that imposed requirements on members and officers about chain of command, a code of conduct, and a process for disciplining members who do not comply with the national rules, among other things. The rules highlight the close relationship and mutually beneficial relationship between the National fraternity and its local chapter and individual members. The National Attorneys impose a complex hierarchy of rules and regulations on local chapters and individual members along with the fraternities' National Constitution that sets out a clear command structure to which the local chapters must adhere.

524.   It was reasonably foreseeable, given Defendants Regents, EMUPD, and ASP Defendants' knowledge, that certain members were sexual predators of

vulnerable college students at the time Defendants received complaints regarding sexual misconduct involving members of ASP Defendants.

525.   ASP Defendants by and through their members, agents, managers and/or assigns, knew or reasonably should have known of its members' conduct and/or that certain members were unfit as members, agents, and/or representatives of ASP Defendants because of their repeated sexual misconduct.

526.   Per ASP Defendants' rules, regulations, and bylaws, its members are to conduct themselves in the following, non-exhaustive ways:

> a.   Reduce exposure to risk and liability of the fraternity and its members;
>
> b.   Aim to reduce risk;
>
> c.   Complete an incident report and submit the same to Headquarters for all incidents;
>
> d.   Educate members on ASP Defendants' alcohol policies;
>
> e.   Respect the dignity of all persons, and therefore, avoid physical, psychological, or sexual abuse any human being;
>
> f.   Do not abuse, nor support the abuse of, alcohol or controlled substances;
>
> g.   Do not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional.  This is to include any actions, activities, or events, whether on chapter premises or an off-site location which are demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together;

h.   Familiarize and comply with ASP Defendants' Health and Safety Policies, which explicitly forbid any form of hazing or assault;

i.   Prohibit alcohol and/or illegal substances, which is punishable by fine and/or expulsion; and

j.   Maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

527.   ASP Defendants breached their duty to provide reasonable supervision of their members, and permitted the same to commit the pervasive acts against Plaintiffs and others.

528.   The sexual abuse occurred while on the premises of Defendant Regents, specifically the premises on EMU's campus of ASP Defendants, and while their members were acting in the course of their membership, agency, and/or representation of ASP Defendants.

529.   ASP Defendants tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, with the result that their members were allowed to violate the rights of persons such as Plaintiffs with impunity.

## COUNT XII
## NEGLIGENT FAILURE TO WARN OR PROTECT
### *As to Defendants ASP – Chapter and National*

530.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

531. ASP Defendants knew or should have known that certain members posed a risk of harm to Plaintiffs or those in Plaintiffs' situation.

532. ASP Defendants had direct, actual knowledge as to the dangerous conduct of particular members and failed to act reasonably and appropriately in response.

533. ASP Defendants knew or should have known their members committed sexual assaults, abuse, and molestations and/or were continuing to engage in such conduct.

534. ASP Defendants had a duty to warn or protect Plaintiffs and others in Plaintiffs' situation against the risk of injury by particular members of ASP Defendants. These include but are not limited to:

   a.   Reduce exposure to risk and liability of the fraternity and its members;

   b.   Complete an incident report and submit the same to Headquarters for all incidents;

   c.   Educate members on ASP Defendants' alcohol policies;

   d.   Respect the dignity of all persons, and therefore, avoid physical, psychological, or sexual abuse any human being;

   e.   Do not abuse, nor support the abuse of, alcohol or controlled substances;

   f.   Do not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional. This is to include any actions, activities, or events, whether on chapter premises or an off-site location which are

demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together;

g.    Familiarize and comply with ASP Defendants' Health and Safety Policies, which explicitly forbid any form of hazing or assault;

h.    Prohibit of alcohol and/or illegal substances, which is punishable by fine and/or expulsion; and,

i.    Maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

535. The duty to disclose this information arose by the relationship between its members, agents, and or representatives of ASP Defendants and Plaintiffs.

536. ASP Defendants breached said duties by failing to warn Plaintiffs and/or by failing to take reasonable steps to protect Plaintiffs.

537. ASP Defendants breached their duties to protect Plaintiffs by failing to:

a.    Respond to allegations of sexual assault, abuse, and molestation;

b.    Act on evidence of sexual assault, abuse, and molestation; and,

c.    Investigate, adjudicate, and terminate certain members' membership with Defendants ASP – Chapter and/or ASP – National.

538. ASP Defendants willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiffs from sexually violent and perverse conduct by its members.

## **COUNT XIII**
## **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
### *As to all EMU Defendants and ASP – Chapter*

539.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

540.   Defendant ASP – Chapter was aware that its members committed and/or were committing sexual assaults of students and guests of EMU.

541.   Defendant ASP – Chapter tolerated and/or permitted its members to sexually, abuse, and rape students and guests of EMU after it knew or should have known of complaints and claims of sexual assaults occurring since 2014.

542.   Defendant ASP – Chapter's supplying and serving of excessive amounts of alcohol to students and guests on campus at parties was known, expected, accepted, or acquiesced as commonplace among Defendant ASP – Chapter.

543.   Members of Defendant ASP – Chapter threatened, misled, and otherwise discouraged victims from reporting hazing and/or sexual assaults by members of Defendant ASP – Chapter to the appropriate persons at EMU, Title IX, or other law enforcement.

544.   Defendant ASP – Chapter chose not to adequately supervise members and/or prevent members from committing acts of hazing, sexual assaults, and rapes.

545.   By routinely ignoring, disregarding, and failing to investigate evidence of hazing and sexual assaults by members of Defendants ASP – Chapter, Defendants created a culture and environment in which victims understood and/or were told that their complaints would be met with disbelief, indifference, and a cold shoulder, and

thus victims understood and/or were told that no measures would be reasonably calculated to end the abuse.

546.   Defendants ASP – Chapter's conduct, and conduct of members, as described above has been consistently condemned as outrageous and intolerable in modern society by state and federal legislature, EMU student policies, bylaws, and regulations of ASP Defendants and other members of the public.

547.   Defendant ASP – Chapter's conduct, and conduct of members, as described above was intentional and/or reckless.

548.   Defendant ASP – Chapter's conduct, and conduct of members, as described above was extreme, outrageous, and of such character as not to be tolerated by a civilized society.

549.   Any reasonable person would know that emotional distress would result from Defendant ASP – Chapter's reckless conduct, and reckless conduct of members, described above.

550.   Defendant Regents abused their positions to bolster and sustain EMU's national reputation.

551.   Defendants Regents and ASP – Chapter threatened, misled, and otherwise discouraged students/Plaintiffs from reporting sexual assault to the appropriate persons at EMU or to law enforcement.

552.   By routinely ignoring, disregarding, and failing to investigate sexual assault allegations, Defendants created a culture and environment in which sexual abuse victims understood that their complaints would be met with hostility, disbelief and indifference, and thus victims understood that the university would not take any measures reasonably calculated to end the abuse.

553.   Defendants performed a deficient and biased investigation into sexual assaults and allowed perpetrators to remain on campus, where they were permitted access to female students and, in some cases, they continued to sexually assault.

554.   Defendants' conduct as described above has been consistently condemned as outrageous and intolerable in modern society by members of the public, members of the media, students, alumni, and other members of the public.

555.   Defendants' conduct as described above was intentional and/or reckless.

556.   Defendants' conduct as described above was extreme, outrageous, and of such character as not to be tolerated by a civilized society.

557.   Any reasonable person would know that emotional distress would result from Defendants' reckless conduct described above.

**COUNT XIV**
**SOCIAL HOST LIABILITY**
**VIOLATION OF MCL §436.1701**
*As to Defendant ASP – Chapter*

558.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

559.   All Plaintiffs were under the age of 21 and could not legally drink alcohol in the State of Michigan.

560.   Defendant ASP – Chapter repeatedly supplied and served alcohol at functions on EMU's campus, in direct violation of local and national bylaws and regulations, as well as policies as set forth by Defendant Regents.

561.   Defendant ASP – Chapter knowingly, intentionally, and/or recklessly created a dangerous environment by serving excessive amounts of alcohol.

562.   Defendant ASP – Chapter was negligent when it failed to make diligent inquiry into whether Plaintiffs were of the age that allowed them to legally drink in violation of MCL §436.1701.

563.   Defendant ASP – Chapter served alcohol to Plaintiffs at all chapter parties including those attended by Plaintiffs, including but not limited to the dates and times when Plaintiffs were subjected to sexual harassment, sexual assaults and other prohibited conduct by chapter members.

564.   Defendant's actions and/or inaction constitute a violation of MCL §436.1701.

565.   Defendant's actions and/or inactions in violation of MCL §436.1701 necessarily led to Plaintiffs' sexual assaults.

## COUNT XV
## VIOLATION OF ARTICLE 1, § 17 SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER
### *AS TO DEFENDANT EMU REGENTS*

566. Plaintiffs reallege and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

567. Plaintiffs enjoy a substantive due process right under the Michigan Constitution to avoid the risk of harm or danger created or increased by an affirmative act of the state.

568. This right is violated when the state (1) engaged in an affirmative act which either created or increased the risk that a plaintiff would be exposed to an act of violence by a third party; (2) placed a plaintiff in a special danger, as distinguished from a risk that affects the public at large; and, (3) knew or should have known that its actions specifically endangered Plaintiff.

569. Defendants EMU Regents, EMUPD, Werner, Heighes and Karrick's affirmative acts consisted of:

      a.    Failure to investigate;

      b.    Failure to report;

      c.    Failure to take remedial action;

      d.    Failure to protect students;

      e.    Failure to follow state and federal laws including, but not limited to, Title IX, ELCRA, and the Clery Act.

570.   These affirmative acts created or increased the risk that Plaintiffs would be exposed to an act of violence or sexual assault by EMU's Greek system, namely Defendants ASP – Chapter.

571.   Defendants EMU Regents, EMUPD, Werner, Heighes and Karrick's conduct created a special danger to Plaintiffs and others alike because the Defendants' actions specifically put this discrete group – female students and/or guests of EMU, some of whom are particularly vulnerable, especially minors who are provided intoxicants on or within the jurisdiction of EMU's campus – at increased risk in that the Defendants knew that EMU's Greek system, namely Defendants ASP – Chapter were taking advantage of the same in order to carry out sexual harassment, sexual assaults, and other prohibited conduct against Plaintiffs and other members of the same discrete group.

572.   Defendants EMU Regents, EMUPD, Werner, Heighes and Karrick knew or should have known that its affirmative acts specifically endangered Plaintiff.

573.   Defendants EMU Regents, EMUPD, Werner, Heighes and Karrick established official policies, customs and practices, which permitted, condoned and actually promoted EMU's culture of repeated sexual harassment, sexual assaults, and other prohibited conduct.

574.   The decisions resulting in Defendants' violation of Plaintiffs' constitutional rights as alleged in this Complaint were made by high level officials of Defendants.

575.   Defendants' official policies, customs and practices violated Plaintiffs' rights which each independently violated Plaintiff's rights.

576.   Defendants' policies, customs and practices of permitting, condoning and concealing sexual harassment, sexual assaults, and other prohibited conduct, which enabled EMU's Greek Life, namely Defendants ASP – Chapter to gain unfettered sexual access to vulnerable students and/or guests of EMU, exposed them to unspeakable invasions of their bodily integrity which were so egregious and outrageous that it shocks the conscience.

## PLAINTIFFS' DAMAGES

577.   Plaintiffs' damages arise from three distinct and exclusive harms: 1) the physical sexual harassment, assaults and/or prohibited conduct; 2) Defendants' failure to properly investigate the Title IX violations occurring on EMU's campus and/or within Defendant EMUPD's jurisdiction; and 3) Defendants' collaborative efforts to actively conceal any and all reports of sexual harassment, sexual assaults and/or other prohibited conduct.

578.   Since the revelation of Defendants' fraudulent concealment of Title IX violations, Plaintiffs for years have been suffering shame, shock, humiliation,

emotional distress and related physical manifestations thereof, embarrassment, loss of self-esteem, and disgrace.

579.   Defendants' conduct and concealment of the same has disturbed Plaintiffs' innate sense of self-worth and self-identity, leading to anxiety and depression.

580.   The revelation – that despite knowing of EMU's Greek Life culture of alcohol abuse and sexual misconduct, Defendants knowingly protected its Greek Life members allowing them unfettered access to prey upon female students and guests – has been traumatic and emotionally and psychologically damaging, forcing Plaintiffs to relive the trauma of what Defendants had previously kept hidden.

581.   Plaintiffs have been shattered psychologically and emotionally to learn the university they held so much trust and pride in betrayed them, and many others, by failing to properly investigate countless reports of sexual harassment, sexual assaults and other prohibited conduct and actively concealing the same in an effort to maintain the image of a safe environment while at the same time continue to receive federal funding.

582.   As a direct and/or proximate result of Defendants' conduct, Plaintiffs suffered, and will continue to suffer discomfort, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, suicide, suicidal ideations and

self-injurious conduct, drop in academic performance, withdrawal from classes and school, ostracism by members Greek Life, loss of earnings and earning capacity, and such other injuries and physical manifestations as may be revealed through the course of discovery and trial in this matter.

583.    These irreparable harms Plaintiffs suffer, and will continue suffering, are proven damages typically suffered by young women when sexually assaulted and not provided proper attention, concern, and investigation.

584.    Symptoms of sexual abuse can last for decades and affect Plaintiffs' lives in many ways from causing sexual discomfort and inability to engage in close relationships with others to confusion about sexual identity, embarrassment and depression.

585.    When sexual abuse is reported and subsequently concealed, victims often lack the ability to comprehend the abuse due to their trust in the system and their detrimental reliance upon those in a position of authority who can take preventive action and provide support, and commonly suffer from emotional distress and humiliation.

586.    In whole or in part, as a result of some or all of the above actions and/or inactions of Defendants, Plaintiffs have and continue to suffer irreparable harm.

WHEREFORE, Plaintiffs JANE DOE 20-23 and JOHN DOE 24, respectfully request that this Honorable Court enter a judgment against Defendants, jointly and

severally, in an amount in excess of $75,000.00, together with interest, costs, attorney fees, and all other equitable relief, including but not limited to exemplary and/or punitive damages, that this Honorable Court deems just and proper.

Plaintiffs further seek non-monetary relief, including the establishment of a Truth and Reconciliation Commission, who will require all Defendants and their agents and employees to fully and unequivocally admit their responsibility for permitting, condoning, and promoting a culture of sexual assault at EMU and who will create a process to provide for historical accountability and healing with a focus on the survivors, future supervision, monitoring, and auditing. The Plaintiffs further request that EMU commit to the will hiring of an independent, trauma-informed Expert, with experience in childhood sexual abuse involving betrayal trauma/institutional betrayal, to be selected to work in conjunction with the Truth and Reconciliation Commission whose members will include Survivors and EMU officials and who will study past institutional failures with the goal to create an accountable, effective and equitable institution by identifying future needs to help survivors heal and implement steps to ensure student safety and well-being.

Respectfully submitted,
*/s/ Todd F. Flood*
Todd F. Flood (P58555)
Vincent J. Haisha (P76506)

John H. Mott (P81990)
Flood Law PLLC
Attorneys for Plaintiffs
155 W. Congress St., Ste. 603
Detroit, MI 48227
Tel: (248) 547-1032
tflood@floodlaw.com
vhaisha@floodlaw.com
jmott@floodlaw.com

Mike Weaver (P43985)
Plunkett Cooney
38505 Woodward Avenue, Ste. 2000
Bloomfield Hills, MI 48304
mweaver@plunkettcooney.com

Date: September 8, 2021

## **DEMAND FOR JURY TRIAL**

Plaintiffs JANE DOE 20-23 and JOHN DOE 24, by and through counsel Todd

Flood and Flood Law PLLC, and Michael Weaver and Plunkett Cooney PLC, hereby

demand a trial by jury in the above-captioned matter.

<div style="margin-left: 50%;">

Respectfully submitted,
*/s/ Todd F. Flood*
Todd F. Flood (P58555)
Flood Law PLLC
Attorneys for Plaintiffs
155 W. Congress St., Ste. 603
Detroit, MI 48227
Tel: (248) 547-1032
tflood@floodlaw.com

</div>

Date: September 8, 2021

# EXHIBIT 1

# AFFIDAVIT

STATE OF MICHIGAN     )
                              ) ss
COUNTY OF INGHAM     )

The undersigned deposes and states as follows:

1. I, Devin Hammond, am a resident of the State of Michigan.

2. I am of sound mind and body, and I can testify to the matters contained in this affidavit if I am called to do so.

3. I have personal knowledge of the matters and events described within this affidavit.

4. I began my college career at Eastern Michigan University ("EMU") in the Fall of 2017.

5. I pledged to become a member of the fraternity Delta Tau Delta – Theta Xi chapter at EMU ("DTD") in the Fall of 2017. I became a member of the DTD in April of 2018.

6. I became the chapter secretary of DTD in the Fall of 2018. As secretary, I became a member of DTD's Executive Board and thus became subject to the duties of the Executive Board found in Section 3 of the DTD Chapter Bylaws.

7. It was common knowledge within both the local chapter of DTD and the DTD national organization ("DTD National") that there were bylaws and social rules for which DTD pledges and members must abide.

8. The primary function of DTD was to host parties that would attract as many people as possible. It was expected and well known that all persons in attendance of such parties would consume alcohol–regardless of age.

9. Further, allowing and furnishing alcohol to be consumed by minors was both common place and common knowledge on and around the EMU campus. The same was especially true with regard to social events–both small and large–at DTD.

10. I first learned of a rape at DTD during the Fall of 2017 at a DTD meeting that took place while I was pledging. I was told the rapist's name was Dustyn Durbin ("Durbin"). During the meeting, DTD members discussed whether Durbin should be banned from attending parties at DTD. Ultimately, D.J. McWilliams ("McWilliams") suggested that Durbin should continue to be allowed to attend DTD parties and social gatherings. The members of DTD agreed, and Durbin was not banned.

11. On or about the Fall of 2018, I was told that both McWilliams and Durbin had raped EMU students in early 2018; however, upon inquiry, several upper-class members of DTD downplayed or swept the allegations under the rug.

12. It was a standard practice at DTD parties to have a "sober monitor," a member who stationed at the entrance and whose job it was to observe partygoers going in and out of the fraternity house in order to ensure that they were not intoxicated or otherwise impaired. It was well known that the monitors were typically intoxicated themselves.

## WHAT THE FRATERNITY MEMBERS KNEW ABOUT WILL BUJAKI, MEMBER OF DTD:

13. On or around November 1, 2018, the DTD Executive Board held a meeting wherein the topic of rape came up with regard to Will Bujaki ("Bujaki"), a member of DTD. During the meeting, the Executive Board disclosed that Bujaki had sexually assaulted a female student at the DTD fraternity house during October of 2018.

14. In November of 2018, I learned that the female student described above had reported her rape to the EMU Title IX Department and Melody Werner.

15. At no time did Melody Werner contact anyone from the Board to inquire about the party or details of the allegations.

16. Likewise, neither the EMU Title IX Department nor Melody Werner provided any information to assist the DTD Executive Board with handling allegations of Bujaki's rape.

17. Based on the failure of EMU and in particular Ms. Werner, the DTD Executive Board was not provided with relevant information which would have impacted the DTD Executive Board's decisions regarding Mr. Bujaki. As a result, Bujaki had no restrictions and was observed engaging in a number of activities following the October 2018 sexual assault, including but not limited to:

    a. Inviting women to the DTD fraternity house, including his bedroom and fraternizing with them without limitation;

    b. Supplying alcohol to minors at DTD social events; and

    c. Abusing alcohol at the DTD house wherein he often became unruly and belligerent.

18. In late 2018 or early 2019, I learned that Bujaki had raped another female student in November of 2018.

19. Within the DTD community, it was common knowledge that Bujaki was a sexual predator and that EMU and EMU Title IX office had been informed of multiple complaints of sexual assault within the Greek community at EMU.

20. No one within the EMU administration had taken steps to stop Bujaki from assaulting another victim in November of 2018.

21. If EMU and DTD had taken ordinary steps to investigate and restrict the Bujaki's behavior, it is reasonable to believe that Bujaki's assault of another woman in November of 2018 would never have happened.

22. DTD ultimately suspended Bujaki in the February of 2019.

I do affirm that the above statements are true to the best of my knowledge, information, and belief.

_____
Devin Hammond

Subscribed and sworn before me this

_14_ day of May, 2021, by:

_____

Notary Public, _Washtenaw_ County, MI

My commission expires _02/01/2027_

TAMMY LYNN GASK
Notary Public - State of Michigan
County of Washtenaw
My Commission Expires Feb 1, 2027
Acting in the County of _Washtenaw_